[No. 13975. *En Banc.* September 4, 1917.]

## OREGON-WASHINGTON RAILROAD & NAVIGATION COMPANY, *Respondent*, v. THURSTON COUNTY *et al., Appellants.*[1]

TAXATION—RAILROAD PROPERTY—TAX COMMISSION—POWERS—VALUATION OF OPERATING PROPERTY. Where a railroad company constructed branch lines and terminals subsequent to the time the public service commission determined the value of its operating properties, it becomes the duty of the tax commission to annually fix the valuation of the new operating properties for assessment and taxation, until such time as the same shall be fixed by the public service commission.

SAME—VALUATION OF OPERATING PROPERTY—ACTION TO SET ASIDE—EVIDENCE—ADMISSIBILITY. If the state tax commission and state board of equalization acted upon a fundamentally wrong principle in valuing the operating property of a railroad, that fact may be shown by the formal record of their proceedings and also by oral testimony by members of the board; but members or officers of the board cannot be examined or submitted to cross-examination as adverse party witnesses with regard to the operation of their minds in the valuing and taxing of roads.

SAME. The testimony of the secretary of the state tax commission that the commission did not make any investigation with respect to the fair cash value of the operating properties of a railroad but considered itself bound by the cost figures furnished by the public service commission, is inadmissible as having to do with mental processes of the board by one who was not a member and incompetent as his own conclusion.

SAME — RAILROAD PROPERTY — VALUATION OF PUBLIC SERVICE COMMISSION—CONCLUSIVENESS. The physical value of the old operating properties of a railroad as fixed by the public service commission is conclusive upon the state tax commission in its annual assessments thereof for taxation, subject only to revision by the courts.

SAME—RAILROAD PROPERTY—VALUATION—POWERS OF STATE BOARDS—ACTUAL COST—EVIDENCE—SUFFICIENCY. Where new operating properties of a railroad company have been used only from one to two years, and it is impossible to find its stock or bond value, the actual value is *prima facie* the actual cost of production, as found by the public service commission whose findings though incomplete are conclusive as far as they go, in the absence of enhanced value or of any evidence that the cost paid was not the necessary cost of the

[1]Reported in 167 Pac. 930.

production of the road; hence the tax commission in determining the assessment thereof for taxation properly adopted such actual cost as the basis for arriving at the value; and the same is not overcome by the conclusions of valuation experts based upon inclusive theories that do not agree nor conform to the statutes requiring a physical valuation.

SAME—EXCESSIVE VALUATION — REVIEW BY COURTS — EVIDENCE— SUFFICIENCY. Under the rule that assessments for taxation by legal taxing officers will not be set aside by the courts except for fraud or the clear adoption of a fundamentally wrong principle, and except for such overvaluation as to show fraud or arbitrary action, a ten per cent reduction of an assessment of railroad operating property based upon the actual cost of production as found by the public service commission, cannot be sustained where there was no evidence that the actual cost was not the necessary cost, and nothing to indicate the basis for the trial court's valuation, or any evidence to overthrow the presumption that the assessing boards acted in good faith.

SAME. The fact that a substantial reduction from the actual cost of operating property was allowed by the tax commission to one railroad because the values had not been fixed by the public service commission, and an unexplained reduction was allowed another company, does not sustain a charge of discrimination against a railroad whose operating property was assessed at the valuation fixed by the public service commission; since the assessment of property of others at a lower proportion of its value, does not invalidate a tax of a complaining taxpayer whose property was assessed at its actual value.

Appeal from a judgment of the superior court for Thurston county, D. F. Wright, J., entered November 2, 1916, upon findings in favor of the plaintiff, in an action to enjoin the collection of taxes, tried to the court. Reversed.

*The Attorney General* and *L. L. Thompson, Assistant,* for appellants.

*Bogle, Graves, Merritt & Bogle, Frank C. Owings,* and *A. C. Spencer,* for respondent.

HOLCOMB, J.—This is an independent action to enjoin the collection of taxes levied in Thurston county, upon an assessment made by the state board of tax commissioners in the year 1912, upon the operating properties of the Oregon-

Washington Railroad & Navigation Company in the state of Washington. That board found that the value of those properties as of March 1, 1912, for the entire state, was $48,-646,517, and after determining the proper ratio to be applied in the various counties through which respondent's properties passed, that value was certified to the various counties in the manner prescribed by law. The valuation certified to Thurston county amounted to $220,215, upon which valuation a tax of $8,100.14 was duly levied and extended upon the tax rolls, the collection of which tax this action seeks to prevent. There is no question as to the ratio applied or the certification, the only controversy being as to the total value of these operating properties. Respondent alleges that the tax commission and the state board of equalization proceeded in making this valuation upon a fundamentally wrong basis, that both boards refused to consider evidence offered to them by respondent, and that the true value of such operating properties as of March 1, 1912, was, in fact, $39,707,234. The trial court made findings in exact conformity with the allegations of the complaint, except that it found the value of respondent's properties in Washington as of March 1, 1912, to be $43,775,000, and that the sum of $7,278.89 was, therefore, properly chargeable and collectible against the properties of respondent in Thurston county. Decree was entered accordingly. It will be observed that the assessment found by the court was $4,871,517 less than the assessment found by the state tax commission and state board of equalization, the difference amounting to a little more than ten per cent.

The legislature, during its 1907 session (Laws 1907, p. 132, § 1), imposed upon the state board of tax commissioners the duty of making an annual assessment of the operating railroad properties within the state for the purpose of levying and collecting taxes thereon. At the same session, by an act passed and approved a few days later (Laws 1907, p. 545, § 5), the legislature amended the railroad commission act of the state whereby that commission was empowered, after con-

ducting hearings as prescribed by law, to ascertain the value of the railroad properties within the state. It will thus be seen that the state imposed upon two of its mandataries the duty of determining the true value of the operating railroad properties.

The railroad commission, after a full hearing, determined the value of the operating property of the Oregon Railroad & Navigation Company within the state as of June 30, 1907, to be $19,500,000. At the same time, it found the value of the operating properties of the Northern Pacific Railway Company and the Great Northern Railway Company within the state.

A dispute arose between the two commissions as to whether the valuations found were controlling for the purpose of taxation; the tax commission contending for the right to make its assessment for the purpose of taxation independently of the values ascertained by the railroad commission. To settle the controversy between the two boards and to secure an adjudication of its authority in the premises, the board of tax commissioners selected the Oregon Railroad & Navigation Company (in view of the fact that its assessment was the least of the three) as the railroad upon which to secure a test case.

To bring about the test case, the board of tax commissioners added to the valuation of $19,500,000 fixed by the new commission some $8,000,000, as the value of the Oregon Railroad & Navigation Company's property for the purpose of assessment and taxation in the state as of March 1, 1910. This assessment was challenged by the Oregon Railroad & Navigation Company by writ of review, and the case was decided by this court in *State ex rel. Oregon Railroad & Navigation Co v. Clausen*, 63 Wash. 535, 116 Pac. 7.

In that case it was decided that:

"Where the value of railway property has been fixed by the state railway commission pursuant to the act of 1907 (Rem. & Bal. Code, § 8638) passed March 8th and approved March 16, 1907, which provides for a determination of the

actual value of all railroads by reference to the actual cost of reproduction and that the findings of the railway commission shall be conclusive in any proceeding in which the public and the railroad is interested, the state tax commission has no power to fix another valuation for the purposes of taxation, under the act of 1907 (Rem. & Bal. Code, § 9141), passed February 20th and approved March 6th, which provides that the state tax commission shall determine the annual assessment of the operating property of all railroads by reference to books, papers, market value of the stock, mileage and gross earnings, and personal view, if necessary; in view of both the object to be accomplished by the railway commission act and the fact that it was passed subsequently to the passage of the other act."

In other words, it was determined that, where the railroad commission has acted in pursuance of the mandate of a statute and found the true value of the railroad operating properties, its findings of value were conclusive, and that the tax commission had no power to fix a different value.

While the controversy between these two commissions continued and the litigation was in progress, the owners of the Oregon Railroad & Navigation Company's railway were expending millions of dollars in the state in the construction of branch lines and terminals, which construction was prosecuted subsequent to the time the railroad commission rendered its findings of the value of the Oregon Railroad & Navigation Company's property, and in 1911 it became the duty of the board of tax commissioners to value these new operating properties for assessment and taxation in that year. This is true because of the decision in the *Clausen* case that the two acts of 1907 were not necessarily repugnant, that both might stand, the tax commission having full power to estimate the value of the property until such time as the railroad commission may conduct its hearing and return, for the benefit of the whole state and of its officers, the true value of the property. The railroad commission, or as it is now the public service commission, had not proceeded to ascertain and determine the true value of the new lines of the Oregon

Railroad & Navigation Company after the controversy over the old assessment. The public service commission, however, undertook to ascertain the total of all expenditures made by the Oregon Railroad & Navigation Company and its allied companies in Washington for property improvements and betterments, new construction and new equipment, from the date of the 1907 valuation of the property to the year 1911. The information thus assembled by them was transmitted to the tax commission under date of August 29, 1911, in the form of a letter, and the amount of the expenditures thus made, except expenditures in an operating district of the company which was not in operation March 1, 1911, was added to the commission's ascertained value of $19,500,000 under the old assessment, resulting in a total valuation for assessment purposes for 1911 of $43,230,299, exclusive of a small operating property called the Ilwaco Railroad Company, assessed locally. All the newly constructed and acquired properties in Washington were conveyed to the newly organized company, this respondent, on December 23, 1910.

Prior to March 1, 1912, the Yakima branch, or the third division, had come into operation, and the tax board took the figures of the cost thereof reflected by the letter of the public service commission of August 29, 1911, as the cost of that division, and attached the cost figure thereof to the assessment of the previous year for the value of the entire properties of the respondent as of March 1, 1912, making a grand total of $48,646,517. Respondent appeared before the board of equalization on September 6, 1912, and presented its petition for a revision of the assessment of the board of tax commissioners to $39,707,234.

Respondent asserts that the state tax commission, in determining the value of the operating properties of the respondent for 1912, did not exercise its own judgment and did not make any investigation of the true and actual value of the respondent's properties, but acted vindictively because of the decision in the *Clausen* case, and refused to consider

anything but the cost figures given to it by the public service commission; and that the state board of equalization, composed in part of the members of the state tax commission, also summarily refused to reduce or equalize the figures fixed upon by the tax commission; and that there was discrimination in the assessment valuations between the properties of the respondent and the properties particularly of the Chicago, Milwaukee & St. Paul Railway Company and the Northern Pacific Railway Company, which had also constructed many new lines in the state at about the same time as the new lines were constructed by the respondent. It is therefore contended by the respondent that the pretended assessment complained of was, and is, fraudulent in law, arbitrary, vindictive, discriminatory, and made upon a fundamentally wrong principle.

By chapter 78 of the Laws of 1907, p. 132 (Rem. Code, § 9141 et seq.) the state board of tax commissioners is required to make an annual assessment of the operating property of all railroad companies within the state. Such assessment is required to reflect the true cash value of the property as of the first day of March next preceding the assessment, and the true cash value is required to be "that value at which the property would be taken in payment of a just debt from a solvent debtor." Rem. Code, § 9112. The chapter referred to defines with care the great authority necessarily reposed in the board created, specifies with much detail the information apparently conceived to be necessary for a proper performance of their work, and evidently contemplates that their duties are to be performed with great care and discretion. The act carefully preserves the rights of the taxpayer by according to the taxpayer before the assessing board the right to a hearing upon its own motion and the right to present evidence before such board, and requires the board to ascertain and determine the true cash value of the property involved "according to their best knowl-

edge and judgment." Rem. Code, § 9147. For their governance, the statute then provides:

"For the purpose of determining the true cash value of the property of each company the board may, if deemed necessary, view and inspect the property of such company, and shall consider the reports filed in compliance with this act, and the reports and returns of the company filed in the office of any officer of this state, and such other evidence or information as may have been taken or obtained bearing upon the value of the property of the railroad company assessed." Rem. Code, § 9148.

Respondent then attempts to show, and introduced evidence to the effect, that the state tax commission was arbitrary, capricious, and proceeded upon a fundamentally wrong basis in determining to refuse to consider evidence offered by respondent as to the values of its properties, by showing the attitude of one member of the state tax commission as it was constituted then, that "it is a pretty safe assumption that we are not going below these valuations without regard to the testimony you are going to put in here. And these valuations are the ones we fixed your last year's assessment on." The testimony of the secretary of state board of tax commissioners is also introduced for the purpose of showing that the attitude of a majority of the members of the board was as reflected in the foregoing quotation.

The first contention of the appellants is that the testimony of one of the state tax commissioners and of its secretary, at the time of the making of the assessment and of the hearing thereon, was not permissible to show arbitrary action on the part of the state tax commission and of the state board of equalization; that an assessing officer cannot come into court years after the making of an assessment and attack his own official actions by testimony with respect to prejudice which he had toward decisions of the courts. The case of *Chicago, B. & Q. R. Co. v. Babcock*, 204 U. S. 585, is cited and quoted as follows:

"When we turn to the evidence there is equal ground for criticism. The members of the board were called, including the governor of the state, and submitted to an elaborate cross-examination with regard to the operation of their minds in valuing and taxing the roads. This was wholly improper. In this respect the case does not differ from that of a jury or umpire, if we assume that the members of the board were not entitled to the possibly higher immunities of a judge. . . . Jurymen cannot be called, even on a motion for a new trial in the same case, to testify to the motives and influences that led to their verdict. . . . So, as to arbitrators. . . . Similar reasoning was applied to a judge. . . . A multitude of cases will be found collected in 4 Wigmore, Evidence, §§ 2348, 2349. All the often repeated reasons for the rule as to jurymen apply with redoubled force to the attempt, by exhibiting on cross-examination the confusion of the members' minds, to attack in another proceeding the judgment of a lay tribunal, which is intended, so far as may be, to be final, notwithstanding mistakes of fact or law."

There is no doubt in our minds that taxing and equalizing officers cannot be called and examined, or submitted to cross-examination as adverse party witnesses, with regard to the operation of their minds in the valuing and taxing of roads. Nor could they impeach the result of their actions by giving testimony of improper motives on their part, except as to fraud. The record of their proceedings, however, could be shown in evidence to show that they adopted a fundamentally wrong principle upon which to proceed to value the properties. And if they did adopt such fundamentally wrong principle, that fact could be shown also by oral testimony even by members of the board, as well as by the formal record of their proceedings.

At the time the assessment was made, the tax commission was composed of Messrs. Rockwell, Carrigan and Frost. The state board of equalization was composed of Messrs. Rockwell, Carrigan, Ross and Clausen, Mr. Frost having resigned between the date of the meeting of the tax commissioners in May and the meeting of the board of equalization in Sep-

tember.  Mr. Koors was secretary of the tax commission.  The only witnesses called by respondent to testify in regard to the proceedings of the tax commission and of the equalization board were Mr. Rockwell, former tax commissioner, and Mr. Koors, former secretary.  Mr. Rockwell testified, in substance, that he was a member of the board of tax commissioners for eight years; that, in 1907, the old railroad commission valued the operating properties of the old Oregon Railroad & Navigation Company at $19,500,000; that, at that time, there was more or less disagreement between the tax commission and the railroad commission as to the proper method of valuing public utilities, the tax commission maintaining that there were two values; one for rate making, and one for taxation purposes; that, accordingly, after the finding of the value of the Oregon Railroad & Navigation Company made in 1907, the tax commission selected that road to try out the question, which led to the decision in the *Clausen* case in which it was held that the tax commission was bound by the valuation fixed by the public service commission; that a property had but one value, whether it be for taxation or rate making purposes; that he was disappointed at this decision and thought that it was necessary for some care to be exercised in the future; that, accordingly, when the matter of the assessment of the properties of respondent for 1912 came up, the tax commission called upon the public service commission to furnish them with the value of the properties of this company; that the public service commission furnished them with the cost figures as shown by the books of the company, and that Mr. Fairchild, then a member of the public service commission, informed witness that, if the commission were to make formal finding of value, such figures might be the same.  He further testified that they figured around, trying to get something to hang a valuation on, but that there was no chance to do it on a stock and bond basis because they could never find out what percentage of the bonded indebtedness was apportioned to Washington, or the value of the

stock; that, accordingly, he personally adopted the figures furnished by the public service commission, and that he would not have done this had it not been for the decision in the *Clausen* case. He testified, however, that he did not know what the other members of the board did, but spoke only for himself. Upon cross-examination, Mr. Rockwell testified that, in his judgment, there was a difference between a taxation value and a rate-making value, notwithstanding the *Clausen* case to the contrary, and that there was no chance to get him in line with the *Clausen* decision. In other words, the effect of the testimony of this witness is that he did not believe in the use of the physical valuation for ascertaining the valuation for taxation purposes. The record does not show that Mr. Rockwell entertained any feeling of hostility towards the respondent, but shows merely that he was acrimonious in disposition towards the decision in the *Clausen* case, and that he felt that that decision was unfortunate for the railroad companies, and particularly for the respondent. Rockwell and Koors were the only two witnesses connected with the tax commission or board of equalization whose testimony was introduced by respondent for the purpose of impeaching the assessment attacked. Mr. Koors testified that the tax commission did not pretend to make any investigation with respect to the fair cash value of the properties of respondent, but that it considered it was bound by the cost figures furnished by the public service commission, and further, that the board of equalization claimed that it could not consider the petition for a reduction filed by the respondent, because it was bound by the *Clausen* decision. All this has to do with mental processes of the members of the boards, and coming from one who was not a member, was clearly testimony of his own conclusions and was not competent. There was no other testimony than that of Mr. Koors as to the mental processes of the other members of the tax commission and of the equalization board. Those members might possibly have testified for themselves to the same extent that Mr. Rockwell testi-

fied as to the principle they adopted in arriving at the assessment. The question then to be determined is whether the testimony in the record is sufficient to show arbitrary action on the part of these two boards.

No valuation of the new properties of any of the lines comprising the Oregon-Washington Railroad & Navigation Company had been made by the public service commission. At that time there were not available any figures showing the physical value of these lines or of the additions and betterments made to the properties subsequent to 1907. The tax commission accordingly requested the public service commission to furnish them with these figures. The public service commission sent an engineer to the office of the respondent for the purpose of ascertaining the cost of the new properties from the books of the company. He went and secured figures which, after some revisions and emendations by the chief engineer of the public service commission in conference with the chief auditor of the operating system of the respondent, were forwarded to the tax commission. In fact, the chief auditor of the respondent, after the engineer of the public service commission had taken the figures from the respondent's books, made a correction in which he increased the figures very materially. The tax commission, after deducting certain non-operating properties included in the figures obtained from the public service commission, found a valuation of substantially the same as those cost figures plus the $19,500,000 valuation placed upon the properties of the old Oregon Railroad & Navigation Company by the railroad commission in 1907. Notwithstanding that respondent contends that the old valuation of 1907 was some $5,000,000 excessive by reason of going concern value or good will value being included therein, that valuation is not open to attack. That was the physical valuation placed upon the old properties by a tribunal having conclusive powers, subject only to revision by the courts in proper cases, so to do.

In the *Clausen* case, the logic of the construction of the two statutes of 1907 is irrefutable, notwithstanding the acrimonious criticism of the recalcitrant member of the tax commission. In that case, the amendment to the railroad commission act was commended as follows:

"The amendment to the railroad commission act was not only passed and approved subsequent to the passage of the tax commission act of 1907, but as against the uncertain 'bookkeeping,' 'stock and bond,' and 'capitalization' methods of ascertaining value, to which the tax commission was empowered to resort, with a view of the property if it deemed it necessary, the railroad commission was directed to find the actual value of the property; not to resort to bookkeeping methods or at the peril of the fluctuating stock market, but by reference to the cost of reproduction; not the market value of its stock, but the real value of its property, considering its physical character and its earning capacity. In other words, it was provided that the property of railroads should be valued as the stock of the merchant or the land of the farmer is valued. Although we are reminded by counsel that the taxing authorities are not bound to consider physical value, but may resort to the 'stock and bond' or 'capitalization of earnings' method of taxation, we are undivided in our answer that it was undoubtedly the intent of the legislature, mindful of the evasion of railroad companies in years past, to avoid these methods and put them upon the same plane as the individual whose acre is under his feet. Such methods were and are unfair—unfair to both parties to the tax; and we may well assume that, in passing the amendment to the railroad commission act, the legislature intended just what it said, that *when ascertained*, the value fixed by the railroad commission, after a full judicial hearing and with the aid of its engineers, accountants, experts, and practical and experienced men in every department of railroad engineering, accounting, and construction, should be binding and conclusive upon the public and upon the railroad companies. The legislature intended that the commission's findings should leave no doubt or uncertainty, and they are conclusive as made, unless revised by the courts in a proper proceeding." *State ex rel. Oregon Railroad & Navigation Co. v. Clausen,* 63 Wash. 535, 116 Pac. 7.

Reference was also made in that decision to a subsequent act of the legislature of 1911, page 538, chapter 117, reiterating the legislative will that, when the railroad commission (or public service commission as it now is) shall have valued the property of any public service company as provided for therein, "nothing less than the market value so found by the commission shall be taken as the true value of the property of such company used for the public convenience for the purposes of assessment and taxation." [Rem. Code, § 8626-92].

We thus find it to be the undoubted legislative will of this state that findings of the public service commission as to the values of public service properties shall be conclusive in all proceedings as made, unless revised by the courts in a proper proceeding. In the *Clausen* case, we further said:

"The property can have but one true value, whatever may be the purpose of the investigation; whether it be for the purpose of fixing reasonable rates for transportation of passengers, or carrying freight, or for the purpose of taxation, 'the rule to be applied in ascertaining the value of the property should be the same. . . . The same property cannot rightfully be valued at one sum for the purposes mentioned, and at a different amount for the other.' "

In this case, eliminating the value as found by the railroad commission in 1907, all of the properties here involved were new properties and had been operated over a period of from one to two years. It was impossible to ascertain the stock and bond value of these properties because the bonds had never been apportioned to this state and the stock, being owned by another corporation—the Oregon Short Line Railroad Company, was not for sale. There was, likewise, but little information available with respect to the density of traffic, or other factors of that nature. It is, of course, a necessary rule that, in valuing a railroad, the first inquiry is as to its actual cost. That, *prima facie*, is its value. But if it appears that the actual cost was in excess of the necessary cost, the necessary cost is the proper standard. If it

further appears that the net income of the road does not amount to current rates of interest on its necessary cost, and is not likely to do so, or if the business of the road is likely to be destroyed or impaired by competition or other cause, or if the utility of the road is not equal to its cost, then its value is less than its cost, and must be determined by reference to its utility alone. *State v. Central Pac. R. Co.*, 10 Nev. 47.

The testimony of one other member of the state tax commission at the time the assessment was made—Mr. Frost—was introduced by the appellants in this case, and he testified, among other things, that, in his opinion, until a railroad has been in operation sufficiently long to permit an intelligent comprehension of the character and volume of business it is going to do, there is only one method, and that is, to arrive at the physical value, which, if the railroad is new and reasonably constructed, is approximately the amount of money that has been invested in the construction and acquisition of the right of way and necessary station grounds and terminal holdings, and constructions and equipment of the road. Obviously, we think, this is the proper view, and shows that the state tax commission proceeded upon the only possible basis of arriving at the value of the operating properties. If the findings of the public service commission are binding and conclusive as a whole, certainly they must be as to any part or portion of the facts necessary to enter into their conclusions. They made and furnished the finding as to the cost of these new operating lines and the additions and betterments to the respondent's properties; and, moreover, their figures as to cost were practically furnished and agreed to by respondent. It is not contended by respondent that it could contest these figures as valuation for rate-making purposes. It is true the cost figures do not constitute complete evidence of the true cash value, or such value as the railroad commission was required to ascertain of operating railroad properties, to be considered in making up a proper and rea-

sonable schedule of freight and passenger rates ; nor do cost figures, in all cases, represent that value at which the property would be taken in payment of a just debt from a solvent debtor.   In fact, the cost of production of the new lines and betterments might depreciate so that, in a few years, the operating properties would be worth much less ; and, on the other hand, they might enhance so that, in a few years, they would be worth much more.   But it is manifest that the cost of production, within an appreciably short time of the time of valuation must be a very considerable element in determining the true cash value, or that value at which the property would be taken in payment of a just debt from a solvent debtor.   If the cost paid out was not the necessary cost of the production of the property, it was incumbent upon the respondent to show what unnecessary sums were paid out in construction and acquisition of the properties.   If there was an enhanced value, it was, of course, incumbent upon the state tax commission to ascertain the enhanced value and determine upon that as the true cash value at the time of the assessment.

The respondent did not introduce, or attempt to introduce, in evidence any testimony tending to show that the cost figures furnished by it to the public service commission, and by that board to the tax commission, were not the *necessary* costs of construction and acquisition of their properties, or that they were not judiciously and soundly expended.   All that they attempted to introduce was testimony of alleged valuation experts, giving their conclusions as to the values of the various operating properties of respondent based upon certain methods of calculation.   These methods, in some instances, show themselves to be inconclusive, because, in their testimony, they assume that, if certain theories· be adopted, then a certain value is arrived at ; and if certain other theories be adopted, then their valuation is another figure ; and none of them agree.   The properties of respondent were assuredly operating properties.   They were, with but a few

exceptions, none of them abandoned properties, and these, we may assume, were eliminated by the fact that valuation arrived at by the tax commission was somewhat less than the cost figures obtained from the public service commission; and, whatever the theories of the so-called experts in arriving at the values of the property, the method of obtaining the same is practically fixed by the statute in this state, and few of them in their theories conformed to the statute.

In *National Lum. & Mfg. Co. v. Chehalis County*, 86 Wash. 483, 150 Pac. 1164, we had before us the question of the correctness of an assessment made upon a sawmill plant. The assessor adopted the depreciated value of the plant as found by an appraisal company. The company claimed that this was not a correct method of valuation. We said:

"Finding the new replacement value, and then deducting from this the amount of the depreciation, is one way of finding the actual value. The new replacement value, less the depreciation, would give the depreciated value."

That would be true in the instant case. But there was no testimony offered as to depreciated value, and therefore the tax commission could only find a new replacement or reproduction value, and that value, where there was nothing else shown or capable of ascertaining than the original cost of construction and acquisition of properties within a very short time thereof, ought to be considered the principal factor in determining the true cash value. In fact, there was nothing else to do.

We are utterly unable to ascertain upon what basis the trial court arrived at his valuation. It is considerably higher than the valuations placed upon the property by the respondent's experts, without any analysis showing his revisions thereof, and is a little more than ten per cent lower than the valuation fixed by the state tax commission and the board of equalization. It is too well established in this state, that the principle governing such cases as this is that, in an independent proceeding attacking the assessment findings of as-

sessment boards or officers, courts will not consider complaints as to the results reached by the legal taxing officers, except those based on fraud or the clear adoption of a fundamentally wrong principle, to require any citation of precedent. And it has been well established that, where the complaint is merely as to overvaluation, unless the excessive valuation is so great as to clearly manifest arbitrary conduct or fraud on the part of the assessing officers, such assessments will not be overturned. There is not sufficient evidence in this record to overthrow the presumption that the assessing boards acted in good faith, or to show that their actions were arbitrary and erroneous. Since we are unable to ascertain upon what basis the trial court arrived at the valuation made by it by any analysis of the testimony in this regard, we are forced to the view that the assessment and equalization thereof made by the state tax commission and the state board of equalization should stand.

As to the charge of discrimination against the respondent and in favor of the Milwaukee and Northern Pacific companies, the only showing made by respondent in that regard is that the Milwaukee secured a reduction of approximately 14.7 per cent from cost of their new lines, and the Northern Pacific a reduction of $4,000,000 from cost of their newly constructed lines prior to 1912, which had not been valued by the public service commission.

It is contended that the testimony of Mr. Rockwell vitiates the assessment of the respondent's property, which was not reduced from its cost price, it being as follows:

"When we came to equalize them we fixed the value at the value found by the public service commission. There might have been some little change by reason of the deduction of non-operating property that was assessed locally. We allowed a substantial reduction from the cost of the Milwaukee because the public service commission never had valued the Milwaukee and we did not attach much importance to their cost figures."

And, therefore, it is argued that it appears that, in assessing these new properties, cost controlled in the case of the Oregon-Washington Railroad & Navigation Company but was regarded of little importance in the case of the Milwaukee, while the reduction in the Northern Pacific's case is not explained at all. But we are not advised as to whether or not the Milwaukee company produced evidence which justified the equalization in its case and the Northern Pacific in its case. In any event, the presumption as to the regularity and good faith of the assessments attaches. And, so far as the difference between the values is concerned, the well established rule in this case is as stated in *Doty Lum. & Shingle Co. v. Lewis County*, 60 Wash. 428, 111 Pac. 562, Ann. Cas. 1912B 870:

"The assessment of the property of others at a lower proportion of its value than that of a complaining taxpayer, which is not assessed at more than its cash value as required by law, does not make the tax invalid unless the assessment was fraudulently made."

That the assessment here was fraudulently made, we cannot perceive.

We are convinced that the decree of the trial court was erroneous and must be reversed.

Reversed.

ELLIS, C. J., MORRIS, MAIN, PARKER, FULLERTON, and WEBSTER, JJ., concur.