**CUMBERLAND PIPE LINE CO. v. LEWIS et al.**

(District Court, E. D. Kentucky. September 14, 1926.)

No. 1021.

1. **Taxation ☞376(1)—Capitalization of net income method of valuing pipe line company's franchise for purpose of assessment without regard to probable future earnings held fundamentally wrong (Ky. St. §§ 4077, 4079; Const. Ky. § 172).**

Under Ky. St. §§ 4077, 4079, valuation of pipe line company's franchise at the difference between the value of the company's capital stock (determined by capitalizing at 7 per cent. the average net earnings for the last three years) and the value of the company's tangible property without regard to probable future earnings *held* fundamentally wrong, and company entitled to injunction against collection of tax so assessed on payment of tax reasonably due, in view of Const. Ky. § 172.

2. **Courts ☞282(10)—Wrong use of capitalization of net income method in valuing pipe line company's franchise held "taking" of property without due process, giving federal court jurisdiction to grant relief (Const. Amend. 14).**

Valuation of pipe line company's franchise by fundamentally wrong capitalization of net income method *held* "taking" of property without due process of law, in violation of Const. Amend. 14, giving federal court jurisdiction to grant equitable relief.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Taking.]

3. **Taxation ☞376(1)—Capitalization of net income method is not the only permissible method of valuing pipe line company's franchise under state statutes (Ky. St. §§ 4077, 4079).**

Under Ky. St. §§ 4077, 4079, capitalization of net income is not the only method of valuing pipe line company's franchise which state tax commission may properly use.

4. **Taxation ☞610—Payment of taxes justly due held condition precedent to injunction against enforcement of excessive assessment.**

Pipe line company as condition precedent to injunction against enforcement of excessive assessment of franchise for taxation *held* required to pay taxes justly due.

5. **Taxation ☞40(8)—Action of assessing authorities cannot be overthrown for inequality, unless intentional discrimination be shown.**

Action of assessing authorities cannot be overthrown on the ground of inequality, unless there has been an intentional discrimination, which may be made out by showing that other property subject to ad valorem taxation was uniformly assessed at a lower percentage of its fair value than that of complaining party.

6. **Taxation ☞375(1)—Assessment of pipe line company's right of way, pipe line, and pumping machinery as personal property held improper (Acts Ky. Ex. Sess. 1917, c. 1, § 11, as re-enacted by Acts Ky. 1922, c. 114, § 3; Ky. St. §§ 458, 4022).**

Assessment of pipe line company's right of way, pipe line embedded in the ground, and pumping machinery set in concrete rigidly attached to the ground as personal property, by commission acting under Acts Ky. Ex Sess. 1917, c. 1, § 11, as re-enacted by Acts Ky. 1922, c. 114, § 3, *held* improper, in view of Ky. St. §§ 458, 4022.

7. **Taxation ☞611(5)—In suit to enjoin enforcement of tax assessment, plaintiff held entitled to leave to amend bill by addition of prayer for relief to which it was shown entitled.**

Pipe line company, in suit to enjoin enforcement of assessment of franchise, *held* entitled to leave to amend bill by addition of prayer for special relief against assessment of certain property as personalty, instead of realty to which it was shown entitled.

In Equity. Suit for injunction by the Cumberland Pipe Line Company against John B. Lewis and others, constituting the Tax Commission of the State of Kentucky. Interlocutory decree for plaintiff.

O'Rear, Fowler & Wallace, of Frankfort, Ky., John H. Gardner, of Winchester, Ky., and Frank L. Crawford, of New York, N. Y., for plaintiff.

Frank E. Dougherty, Atty. Gen., Overton S. Hogan, Asst. Atty. Gen., and S. D. Rouse, of Covington, Ky., for defendants.

Before MOORMAN, Circuit Judge, and COCHRAN and DAWSON, District Judges.

ANDREW M. J. COCHRAN, District Judge. This is a three judge case. The interlocutory injunction sought is, in the main, to restrain the enforcement of the assessment of plaintiff's franchise for taxation for the year 1924, made April 29, 1925, as of date December 31, 1923, under section 4077 et seq., Kentucky Statutes.

[1] The procedure followed was that required by section 4079. The value of plaintiff's capital stock was first fixed. The assessed value of its tangible property was then deducted from such value; and the remainder was the sum at which plaintiff's franchise was assessed. The value at which its capital stock was so fixed was the sum of $7,550,227. This was arrived at by the capitalization of net income method. The commission took plaintiff's net income for the years 1921, 1922, and 1923, and ascertained the average yearly net income for those three years. This it capitalized at 7 per cent. The net income for those three years was:

| | |
|---|---:|
| 1921 | $ 292,297.35 |
| 1922 | 629,342.84 |
| 1923 | 663,907.54 |
| Total for three years | $1,585,547.73 |

The average yearly net income was one-third of this, or $528,515.91. This, so capi-

talized, produced the sum of $7,550,227, at which the value of the capital stock was fixed. The assessment of plaintiff's tangible property was $2,066,179, of which $1,967,001 was on account of personalty and $99,178 on account of realty. This, deducted from $7,-550,227, the value at which the capital stock was fixed, left the sum of $5,484,048, at which plaintiff's franchise was assessed, of which assessment complaint is made.

The particulars in which plaintiff complains of this assessment, and on the basis of which it seeks the interlocutory injunction, are two. One is in fixing the value of its capital stock at the sum of $7,550,227. The other is in assessing its franchise at more than 70 per cent. of the sum of $5,484,048. In order that plaintiff may be entitled to the interlocutory injunction, because of the commission's fixing of the value of plaintiff's capital stock at the sum of $7,550,227, it is essential, according to the decision of the Kentucky Court of Appeals in the case of Kentucky Heating Co. v. Louisville, 174 Ky. 142, 148, 192 S. W. 4, that the commission, in so fixing, acted "corruptly or fraudulently," or the valuation which it made must have been "so excessive" as to amount to "spoliation." In the case of Louisville & N. R. Co. v. Greene, 244 U. S. 522, 536, 37 S. Ct. 683, 61 L. Ed. 1291, Ann. Cas. 1917E, 97, it is said that it is essential that the commission "proceeded upon an erroneous principle or adopted an improper method of estimating the value." The matter was better put in the case of Chicago, B. & Q. R. R. Co. v. Babcock, 204 U. S. 585, 596, 27 S. Ct. 326, 51 L. Ed. 636, where it was said that it was essential that there was "fraud or a clear adoption of a fundamentally wrong principle."

[2] There is no room to claim that there was any fraud on the part of the commission in fixing such value. It acted in good faith. Plaintiff's case here, therefore, is whether it is clear that, in so doing, it adopted a fundamentally wrong principle. If the fixing of the value of plaintiff's capital stock at the sum complained of was the result of the adoption of such a principle, then the assessment deprived plaintiff (i. e., potentially) of its property without due process of law, in violation of the Fourteenth Amendment, and this court has jurisdiction to grant such relief. The claim that the commission should not have assessed plaintiff's franchise at more than 70 per cent. of the sum of $5,484,048 is also based on the Fourteenth Amendment. Thereby the commission denied it the equal protection of the laws. This was so, because uniformly and systematically, and hence intentionally, all other property in Kentucky subject to ad valorem taxation is assessed by the assessing authorities at no more than that percentage of its fair cash value.

If, however, the first position taken by plaintiff is found to be well taken, it will not be necessary to consider the second, except in determining the amount at which plaintiff's franchise should be assessed. As stated, the commission, in fixing the sum of $7,550,227 as the value of plaintiff's capital stock pursued the capitalization of net income method. It ascertained plaintiff's average yearly net income for the years 1921, 1922, and 1923, and capitalized that average at 7 per cent. This yielded the sum at which it fixed the value of plaintiff's capital stock.

[3] Defendants would have it that such was the only method which the commission was entitled to pursue. This position is based on the decisions of the Kentucky Court of Appeals in the cases of Commonwealth v. Kottmyer, 183 Ky. 163, 208 S. W. 823, and Bosworth v. Kentucky Highlands R. Co., 183 Ky. 749, 210 S. W. 671. In each of those cases the capitalization of net income method was pursued. But this was so because it so happened that this was the only method applicable thereto. The Kottmyer Case involved the assessment of a ferry franchise owned by an individual. The Kentucky Highlands R. R. Co. Case involved the assessment of a franchise of a railroad corporation, which operated 6.46 miles of railroad. It is not unlikely that its entire issue of stock and bonds was held and owned by the Louisville & Nashville Railroad Company. At any rate, there is no indication that they had any market value to which an appeal could be made in fixing the value of the corporation's capital stock. It is true that the court had this to say:

"By sections 4079 and 4080, Kentucky Statutes, the mode of finding and fixing the value of a franchise of a railroad organized under the laws of this commonwealth is pointed out, though not as clearly as it could or should have been. Reading these two sections together, we conceive the fair import to be: The board of valuation should fix the value of the capital stock by capitalizing the net income derived from the business in this state, and from the amount thus fixed shall deduct the assessed value of all the tangible property assessed in this state and the remainder thus found shall be the value of the corporate franchise subject to taxation."

But there was a slip in saying that the statute provided that the value of the capital stock should be fixed by the capitaliza-

tion of net income. The statute contains no such provision. It simply provides that the board—as it was then; now commission—shall fix such value, without stating anything on the subject as to how it shall fix it. This left it to the board to adopt any reasonable method for fixing such value. It was in this particular only that it could be said there was any want of clearness in the statute. The Court of Appeals in the early case of Hager v. American Surety Co., 121 Ky. 791, 90 S. W. 550, referred to three methods of fixing such value, to wit: Stock and bond; addition of capital and surplus—i. e., book value; and capitalization of net income. It again referred to these three methods in the late case of Chesapeake & Ohio R. Co. v. Commonwealth, 190 Ky. 522, 228 S. W. 15, which followed the two cases in 183 Ky.

There is no indication, in the litigation which has grown out of such assessments, that the board or commission ever availed itself of the book value method. It has adopted either the stock and bond or capitalization of net income methods. In the early cases of Henderson Bridge Co. v. Commonwealth, 99 Ky. 623, 31 S. W. 486, 29 L. R. A. 73, and Commonwealth v. Covington & C. Bridge Co., 114 Ky. 343, 70 S. W. 849, it adopted the stock and bond method. In the railroad assessments, which gave rise to the litigation in this court, subsequently carried to the Supreme Court of the United States, whose opinions are to be found in 244 U. S., it adopted the capitalization of net income method. It is frequently the only method, apart from the book value method, which can be appealed to. In the case of Louisville & N. R. Co. v. Greene, 244 U. S. 522, 540, 37 S. Ct. 683, 61 L. Ed. 1291, Ann. Cas. 1917E, 97, it was said "that there are (at least) two recognized methods, known as the stock and bond plan and capitalization of net income plan."

It is not true, therefore, that the commission, in fixing the value of plaintiff's capital stock was shut up to the capitalization of net income method. Though plaintiff had no outstanding bonds it did have outstanding stock, which had a market value. But, as the method which it did adopt, to wit, the capitalization of net income method, is a well-recognized and approved method, how did it come about that, in adopting that method, the commission proceeded upon a fundamentally wrong principle? It is here that the crux of the question now before us is to be found. It can only have come about that it so did, if the commission had a wrong conception of that method and wrongly applied it to this case. And it must

be said that such was the case. What the commission did was to shut its eyes to the probable net income which would accrue to plaintiff in the future. It took the position that all that was necessary to be considered was plaintiff's net income in the past. What that net income was it had the right to capitalize, without any regard to what might be plaintiff's net income in the future.

That this was fundamentally wrong can be easily established. It is to be borne in mind that the tax, which is provided for in the legislation under which the assessment complained of was made, is not a tax on net income. It is a tax on the franchise of the corporation to which it relates. It is a property tax. It is a tax on the intangible property of such corporations; or, better, it is a tax on the assessed value of their entire belongings over and above the assessed value of their tangible property. If such tangible property has been assessed at full value, then it is true to say that the tax is one on the assessed value of the intangible property. Otherwise it includes a tax on the value of the tangible property, also, to the extent of the deficiency. The figure which the average net income in the past of a corporation, subject to tax under such legislation, cuts in the making of such an assessment, is as an aid in determining the value of its entire belongings. It has no other significance whatever. And the value of such belongings, which is required to be fixed, is their fair cash value, which section 172 of the Constitution of Kentucky defines to be "the price it would bring at a fair voluntary sale."

So it is that, in such a case, the sole bearing which the past net income of the corporation has is as an aid in determining the price which its entire belongings will bring at a fair voluntary sale. And its bearing thereon is not direct. It is indirect. Its direct bearing is on what will be the net income in the future. It is the net income in the future which has direct bearing on the price which such belongings will bring at a fair voluntary sale. This can be brought out by an extreme illustration. No matter what the income of a franchise corporation may have been in the past, if it is a certainty that it will have none in the future, its entire belongings will bring nothing at a fair voluntary sale, except for wrecking purposes, and there can be no franchise for assessment. Any one purchasing property, valuing it from a commercial point of view, will be governed by the probable net income which will arise therefrom in the future. A factor in determining what the future net income will be is what its past net income has been,

and, if there is nothing to indicate to the contrary, it is reasonable to conclude that it will be as good in the future as in the past.

If, then, there was anything in the nature of plaintiff's business which rendered it probable that its future net income would be less than in the past, and the commission in fixing the value of plaintiff's capital stock limited its consideration to plaintiff's past net income, deliberately shutting its eyes to what its future income would be, there is no escaping the conclusion that the commission proceeded upon a fundamentally wrong principle, and potentially deprived plaintiff of its property without due process of law. Much more was such the case if it was a certainty that such income would be less, gradually declining to nothing in a given number of years.

The plaintiff is a Kentucky corporation, and engaged in the operation of a pipe line for the transportation of crude oil, which line is located entirely in this state. It transacts no business outside thereof. Its line traverses 27 counties of the state, all of which are in this district. The total mileage thereof, on December 31, 1923, was 1,306.82 miles. It transports only oil originating in this state, and does not receive oil from other states for through transportation. It follows that the duration of plaintiff's business depends entirely upon the profitable life of the oil deposits which can be reached by its line. Evidence introduced by the plaintiff, which is uncontradicted, is to the effect that that life cannot extend beyond the year 1943; i. e., 20 years from 1923, when plaintiff's business will have to cease. During that 20 years its net income will rapidly decline. The net income which will accrue to it during each of those years will be as follows, to wit:

| | |
|---|---:|
| 1924 | $ 691,580.10 |
| 1925 | 457,486.20 |
| 1926 | 333,222.30 |
| 1927 | 249,752.40 |
| 1928 | 185,110.50 |
| 1929 | 142,434.90 |
| 1930 | 109,162.70 |
| 1931 | 91,600.80 |
| 1932 | 74,028.90 |
| 1933 | 62,733.00 |
| 1934 | 57,713.10 |
| 1935 | 52,693.20 |
| 1936 | 47,693.30 |
| 1937 | 42,653.40 |
| 1938 | 37,634.50 |
| 1939 | 35,751.60 |
| 1940 | 30,731.70 |
| 1941 | 28,849.80 |
| 1942 | 26,967.90 |
| 1943 | 25,655.00 |
| | $2,783,435.30 |

It is not necessary to present in detail plaintiff's evidence to this effect. It is sufficient to say that it is such as to justify acting on it. Defendants do not question the showing which it makes. They content themselves with saying that it is entirely immaterial what may be the truth as to this. The commission, they say, had the right to limit its consideration to the past net income, and its valuation of the plaintiff's capital stock thus reached is unassailable. The possibilities of future discovery of oil in the territory reached by plaintiff's line, or its use as part of a through line, or of the piping being of sufficient value to justify its removal when oil ceases to flow, are not such as to increase the value of plaintiff's belongings.

In view of the future, thus shown to be ahead of the plaintiff, there was no possible room for a finding by the commission that the price which plaintiff's capital stock—i. e., entire belongings—would bring at a fair voluntary sale on December 31, 1923, was a sum that at 7 per cent. interest would yield what had been the average yearly net income received by the plaintiff for the years 1921, 1922, and 1923. There is no room to hold that they would have brought on that date more than the then present worth of the net income which would thus accrue to it during those 20 years; that is, that sum which, invested at 6 per cent., compounded annually, would yield to the purchaser the sum total of such net income during each of those years, and the market value of any assets that plaintiff owned, not a part of its pipe line system. The evidence discloses:

| | |
|---|---:|
| That the present worth on December 31, 1923, of the net income which would thus accrue to plaintiff during the 20 years was | $2,150,852.91 |
| That plaintiff owned nontaxable securities whose net market value was | 1,204,722.61 |
| And that it owned other quick assets whose market value was | 1,052,703.13 |
| Which made the total value of all its belongings | $4,408,278.42 |

According to this, then, the reasonable conclusion is that the fair cash value of plaintiff's capital stock (i. e., of its entire belongings) on December 31, 1923 (i. e., the price which it would bring at a fair voluntary sale), was not exceeding the sum of $4,408,278.42. With this agrees substantially the fair cash value thereof ascertained according to the stock and bond method. As the plaintiff has no outstanding bonds, the stock only is to be considered in the use of this method to ascertain the fair cash value

of plaintiff's capital stock. Prior to January 1, 1923, the outstanding stock of plaintiff held by the stockholders consisted of 15,-000 shares, of the par value of $100 each. On that date the shares were doubled to 30,-000, which made the par value of the entire stock $3,000,000. These shares of stock have for years been dealt in regularly on the New York Curb Exchange, a regularly organized stock exchange. The highest price at which these shares sold on that exchange during the year 1923 was $117 per share. This would make the market value of the entire 30,000 shares $3,510,000. But after that year, and before the bringing of this suit, they had sold as high as $150 per share, which, if taken as the real value on December 31, 1923, would make the entire market value $4,500,000. The public seems to have been slow to realize the value of these shares of stock, for before the number of shares were doubled the highest price paid for a share in 1921 was $147, and in 1922 $175. It is therefore not out of the way to treat the fair cash value of these shares on December 31, 1923, as $4,500,000, and the plaintiff seems not averse to their being so treated.

As stated, this method of ascertaining the fair cash value of a franchise corporation is recognized and upheld by both the Court of Appeals of Kentucky and the Supreme Court of the United States. Where the stock and bonds of the corporation, or stock alone, if there are no bonds, have a market value, there is no reason why this method should not ordinarily be followed. In the cases of Railroad & Telephone Co. v. Board of Equalizers of Tenn. (C. C.) 85 F. 311, and Chicago Union Traction Co. v. State Board (C. C.) 112 F. 607, this method was subjected to criticism, but this on the ground that it gave an exaggerated valuation of the property represented by the stocks and bonds. Those cases concerned railroad, telephone, and street railroad companies, and arose in the days of stock-watering and manipulation. The criticisms made in those cases can hardly be made now, and the market value of the stocks and bonds of such companies, at present, are, in the absence of something exceptional, a fair test of the value of the property represented by them.

In the case of the railroad companies involved in the litigation which arose in this court and was carried to the Supreme Court, heretofore referred to, though capitalization of net income method had been followed by the board, the valuation thus produced was substantially the same as that produced by the stock and bond method. It was only

slightly higher. The plaintiff cites a number of cases in support of the position that what shares of stock sell for on the market is a fair index of their value, and the best one attainable. But that is not the question here. The question here is as to the right to use the price at which shares of stock sell on the market as evidence, not of their value, but of the value of the capital stock of the corporation; i. e., of its entire belongings. This question was met in the case of State Railroad Tax Cases, 92 U. S. 575, 23 L. Ed. 663, where it was said:

"It is therefore obvious that, when you have ascertained the current cash value of the whole funded debt, and the current cash value of the entire number of shares, you have, by the action of those who above all others can best estimate it, ascertained the true value of the road, all its property, its capital stock, and its franchises; for these are all represented by the value of its bonded debt and of the shares of its capital stock."

In the case of Henderson Bridge Co. v. Commonwealth, 99 Ky. 623, 636, 31 S. W. 486, 29 L. R. A. 73, it was said that the shares of stock of a corporation are "a business photograph of all the corporate possessions and possibilities." This would seem to be true, where there are no bonds and the shares of stock have a market value. In the case of Louisville & Nashville R. R. Co. v. Coulter (C. C.) 131 F. 282, 304 this court said:

"All that we would be understood as saying is that, in our opinion, it is reasonable, as a rule, to pursue such a course [i. e., to use the market value of the shares as a standard] in making the valuation of such property for taxation, and that, if such a course is pursued, it cannot be said, nothing else appearing, that the result does not represent the fair cash value of the property."

This would seem to be a case where the stock method is peculiarly applicable. This is so because, in applying the capitalizing of net income method, if it is applied correctly, one has to accept to a certain extent plaintiff's presentation as to the future, whereas, in using the stock method, he has the advantage of the judgment of the investing public. Point is made of the fact that, before the stock was doubled, it sold in the aggregate for much less than it did after it was doubled. This would seem to have been due to a large increase in net income. The net income in 1921 was $292,297.35. In 1922 it rose to $629,342.81. What this increase was due to is not disclosed by the record.

It is therefore apparent that the commission adopted a fundamentally wrong principle in fixing the value of plaintiff's capital stock. Authority for this position is not wanting. In the case of South Utah Mines & Smelters v. Beaver County, 262 U. S. 325, 43 S. Ct. 577, 67 L. Ed. 1004, it was said:

"The value of property bears a relation to the income which it affords. If it be property whose production is uniform and of indefinite duration, the capitalization of the net income derived from it at the going rate of interest, in the absence of a more certain method, will furnish a reasonable measure of the value. The life of a mine, however, is limited. The extraction of ores from year to year constitutes a constant drain upon the capital, which, in course of time, will be exhausted. It follows that a given multiple of the net annual proceeds, which may be a fair measure of value in the early part of a mine's development, will become excessive as the state of exhaustion approaches."

[4] It follows that plaintiff is entitled to the injunction sought, only, however, on condition that it should first pay the taxes which are justly due from it. This necessitates that we, on the data before us, make a finding as to the sum at which plaintiff's franchise should be assessed, from which the amount of taxes due from it can be ascertained. For the reasons heretofore given, we think:

That the value of plaintiff's capital stock should be fixed at the sum of ...................... $4,500,000.00

From this should be deducted plaintiff's nontaxable securities, the net value of which is.. $1,204,722.61

And the assessed value of its tangible property.. 2,066,179.00   3,270,901.61

Leaving a balance of........... $1,229,098.39

—as the 100 per cent. value of plaintiff's franchise. But plaintiff should not be assessed with the full value of such franchise. This is so, because all other property in Kentucky, subject to ad valorem taxation for state and local purposes, was uniformly and systematically and hence intentionally assessed for 1924 at substantially less than its fair cash value. This is conceded by defendants. The only difference between the parties here is as to the percentage of fair cash value at which such property was so assessed. Plaintiff claims that it was not more than 70 per cent.; defendant, that it

was as much as 85 per cent. The conclusion reached in the railroad litigation was that in 1913 all such property, other than that of railroad companies, had been assessed at not more than 60 per cent. of its fair cash value. It is a matter of common knowledge that, since the final termination of that litigation in 1917, the state tax board and commission has been making a determined and vigorous effort to cause the assessment to measure more nearly up to the constitutional standard of fair cash value than theretofore. On the hearing of the pending motion a member of the commission testified that its aim is to equalize the assessments of all such property at 85 per cent. of fair cash value, and that in many of the counties assessments are even higher than that, though in some of them it is a little lower.

Apart from two statements made by the tax commission, one August 1, 1924, and the other February 15, 1925, and one by what is known as the efficiency commission in 1924, plaintiff's showing relates solely to 22 of the 27 counties in which its pipe line is located. It introduced the affidavits of 104 officials and taxpayers living therein, in regard to the percentage of fair cash value at which the tangible real and personal property therein was assessed in 1924. Mainly they put it at 70 per cent., though a few of them put it at 75, and 6 at 80. The first statement of the tax commission referred to was contained in a circular letter addressed to the county tax commissioners and boards of supervisors, and was in these words:

"The average assessment of the lands of the state based upon their transfer values last year, was about 70 per cent. You should have a copy of the transfers which have been furnished you by the county court clerk this year, and if your county falls under 70 per cent. you should assess it so as to have it equal to or above that percentage."

The other was contained in a report to the Governor with reference to the mineral resources of the state, and was in these words:

"This is the basis on which a major portion of the coal that has changed ownership has been sold or contracted for sale (by lease) in the Eastern Kentucky coal field in recent years, and if assessed on its transfer value at the same ratio as other real estate is shown to be assessed, to wit, an average of about 70 per cent. of the price per acre, would be about $51.40."

The statement of the efficiency commission was contained in its report and was in these words:

"There is reason for doubt whether, even after five years of operation under the new legislation, property in Kentucky is on the average being assessed at much over 50 per cent. of its true value."

It should be noted that no showing was made by plaintiff as to the percentage of fair cash value at which the franchises of the numerous franchise corporations, to which class it belongs, were assessed. For aught that appears, they were all assessed at 85 per cent. or more, and none of them are complaining of such assessment. It should be further noted that no showing is made as to the percentage of value at which the tangible real and personal property in the other 99 counties of the state were assessed, apart from the bearing thereon of the statements quoted. The showing as to the 22 counties is met by the affidavits of 110 persons from the same counties, none of whom put the percentage at less than 85 and some as high as 125.

Plaintiff claims that its affidavits are of better quality than defendants. We do not feel called on to argue this. The commission raised the assessments of each one of these 22 counties for the year 1924 to a substantial extent. The assessment referred to in plaintiff's affidavits are to those made by the county tax commissioners and boards of supervisors, and not to what they were after these increases were added to them. The statement made by the efficiency commission is shown to be inaccurate, so far as those 22 counties are concerned, by plaintiff's own affidavits. Its accuracy is further affected by the fact that in the railroad litigation the percentage at which property generally was assessed in 1913 was held to be 60 per cent., and since its termination there has been a decided increase made in the percentage. Then, as to the statements made by the tax commission, this is to be said: The first one was followed immediately by these words: "There are many counties that are assessed from .75 per cent. to 85 per cent. of their transfer values." And no showing is made as to the action of the tax commission for the year 1924, except as to the 22 counties in each of which substantial increases were made. These statements, therefore, are not sufficient to support the position that the tangible real and personal property in the state are assessed at no more than 70 per cent. of their fair cash value.

It may be noted, in passing, that it is questionable as to how far transfers are now, or were in 1924, an aid in determining the percentage of fair cash value at which the tangible real and personal property is assessed. We would have to know more about them than this record discloses before we could form an opinion as to this. This is so because of the likelihood that not many of them show the real consideration for the transfer. It is a matter of common knowledge that many of them—probably the great bulk of them—recite the consideration as $1. It is likely that in all such cases the real consideration is disclosed by the stamps affixed thereto. But how far such information is conveyed to the commission does not appear. Then there is the possibility in certain instances of the consideration being swelled for reselling or other purposes.

[5] In the light of what is presented in the record bearing on this subject, we do not feel justified in holding that plaintiff's assessment should be fixed at less than 85 per cent. of its fair cash value. It is to be borne distinctly in mind that equality in assessment of property for taxation is an ideal which is impossible of realization, and that the action of the assessing authorities cannot be overthrown, on the ground of inequality, unless there has been an intentional discrimination, which may be made out by showing that the other property subject to ad valorem taxation was uniformly and systematically assessed at a lower percentage of its fair cash value than that of the complaining party. And it must be taken that, since the termination of the railroad litigation, the presumption is very strong against any such discrimination. 85 per cent. of $1,229,098.39, the full valuation of plaintiff's franchise, comes to $1,044,733.63. The state tax thereon is 50 cents, which comes to $5,225.66. The plaintiff will be entitled to the interlocutory injunction sought as to the franchise assessment, on condition that it pays this sum, less what it has heretofore paid on this account.

[6] The plaintiff also seeks an interlocutory injunction against the enforcement of the assessment of its tangible real and personal property as made by the state tax commission for 1924. By section 11 of chapter 114, Acts 1922, approved March 24, 1922, sole power was conferred on the commission to assess such property of pipe line companies. As stated, it assessed for 1924 plaintiff's personal property at $1,967,001, and its real property at $99,178. The plaintiff claims that its real property should have been assessed at $1,624,727.99, and its personal property at $441,451.01. It is affected by the classification of its tangible property because the tax on personal property is 50

cents on the $100, whereas that on real property is only 30 cents. The commission classified and assessed plaintiff's right of way, pipe line imbedded in the ground, and pumping machinery set in concrete rigidly attached to the ground as personal property, the total assessment of which amounted to $1,525,549.99, which, added to the $99,178 on account of property classified and assessed as real estate, made the total of $1,624,729.99. It is of this that plaintiff complains.

The right of way in which the pipe line is located were irrevocable and perpetual rights of way granted to plaintiff by instruments of writing under seal. They were not leaseholds. This made them and the pipe line real estate. Authority for this may be found in the cases of Tidewater Pipe Line Co. v. Berry, 53 N. J. Law, 212, 21 A. 490; Standard Oil Co. v. Buchi, 72 N. J. Eq. 492, 66 A. 427; Providence Gas Co. v. Thurber, 2 R. I. 15, 55 Am. Dec. 621; In Matter of Des Moines Water Co., 48 Iowa, 324. And this accords with sections 458 and 4022, Kentucky Statutes.

The defendants base their position that the rights of way and pipe line are personal property on the provision in the grant that plaintiff had the right to remove the pipe line. They cite a number of decisions in support of their contention, but they were all cases involving leases. None of them dealt with a grant in fee of a right of way for a pipe line containing a right of removal.

The amounts at which the assessments of the tangible real and personal property were fixed were those given by the plaintiff. There is nothing to show that they were fixed at more than 85 per cent. of their cash value. Hence no deduction can be made from this assessment on the ground of discrimination. The amount due thereon is as follows, to wit:

30 cents on $624,727.99 . . . . . . . . . . . . $4,874.18
50 cents on $441,451.01 . . . . . . . . . . . . 2,207.25

Which makes a total of . . . . . . . . . . . . $7,081.43

—due from plaintiff to the state on account of this assessment. On the payment of this sum, plaintiff will be entitled to an interlocutory injunction against this assessment. [7] Point is made of the fact that the bill contains no other prayer for special relief than for an interlocutory injunction against the enforcement of the franchise assessment. It does not contain such prayer as to the assessment of the tangible real and personal property. Leave is given plaintiff to amend its bill, by inserting such a prayer for special relief.