**CITY OF DETROIT et al. v. DETROIT & CANADA TUNNEL CO. et al.**

No. 7577.

Circuit Court of Appeals, Sixth Circuit.

Nov. 2, 1937.

Walter Barlow, of Detroit, Mich. (Raymond J. Kelly, of Detroit, Mich., on the brief), for appellants.

Charles E. Lewis and Sherwin A. Hill, both of Detroit, Mich. (Hill, Hamblen, Essery & Lewis, of Detroit, Mich., on the brief), for appellees.

Before HICKS, MACK, and ALLEN, Circuit Judges.

HICKS, Circuit Judge.

In 1927, the Detroit-Ontario Subways, Inc., was incorporated under the laws of Michigan for the purpose of constructing and operating a vehicular tunnel under the Detroit river between Detroit, Mich., and Windsor, Ontario. The corporate name was soon thereafter changed to the Detroit & Canada Tunnel Company, herein called the Company. The land and appurtenances on the Canadian side were owned by a subsidiary, incorporated in Canada. The tunnel was opened for traffic on November 3, 1930. On April 29, 1932, creditors brought a bill against the Company in the District Court seeking, among other things, the appointment of a receiver. Appellee, George R. Cooke, the president of the Company, was appointed.

Ad valorem taxes were assessed against the Company for the years 1932, 1933, and 1934 upon the property located within the City of Detroit. The assessments were first made by the Board of Assessors of the City and upon complaint by the receiver were reviewed by the Board of Review of tax

assessments for the City and finally by the State Tax Commission, also a board of review, and were approved and confirmed by these different boards. After having exhausted all his administrative remedies in an effort to reduce the assessments, the receiver filed petitions in the receivership proceedings against the City of Detroit and its treasurer for the determination of the legality and amount of the assessments for the years involved.

While these petitions were pending appellee Cooke was appointed trustee of the Company in reorganization proceedings in the same District Court under section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207, and became a party as such trustee.

The petitions were consolidated and referred to a master, who found that the assessments were void and reported to the court the amounts which he found to be justly due.

The court confirmed the findings and ordered, upon payment of the amounts indicated, that the Company and receiver should be released from all further liability to the City on account of ad valorem taxes for the years involved and enjoined the City from any attempt to collect more.

The assignments of error raised two major questions: (1) Whether the assessments were final, such that the court had no power of review; and (2) whether they were made fraudulently or on the wrong basis, which involves the subquestion whether the taxing authorities should have given consideration to the capitalized income method of assessment as against what the appellants call "the true cash value" of the property.

A brief description of the tunnel project with a comparison of construction costs, the value of its securities, and the income from its operation, will quickly reveal the crux of the controversy.

Fifty-five per cent. of the tunnel and its appurtenances lay on the Canadian side of the international boundary line and that portion is not involved here.

The tunnel property consisted of a subsurface tube of steel and masonry passing underneath the Detroit river and adjacent land and inclosing a two-way road which emerged on each side of the river upon terminal areas accommodating specially designed ventilation buildings, customs and immigration buildings, toll booths, inspection rooms, and other incidental facilities connected therewith.

The terminal property on the Detroit side consisted of an entire block of land, bounded by Bates, Woodbridge, Atwater, and Randolph streets, and was acquired at a cost of $1,647,199.12. From this terminal square the roadway spiraled down into the tunnel which was constructed under Randolph street by permission of the City of Detroit granted by ordinance. From the end of Randolph street it passed under the river, which property by virtue of the riparian ownership of the City was also controlled by it to the international boundary, and it granted permission to the Company likewise to build under the river.

In the ordinance the City retained the right, upon a year's notice, to purchase the tunnel properties following a specified scale of evaluation; and at the end of sixty years from the date of formal opening the City was authorized to acquire the property without any payment whatever.

The entire cost of the project in round numbers, including the Canadian, and listing such charges as five and a half million dollars (declared value) in franchise rights, one and a half million engineering costs, three and a half million for land, six and a half million for tube and approaches, one million for buildings, two and a quarter million for interest during construction, and a host of smaller items, was over $22,000,000.

Based upon the testimony of the receiver, the court found that the original construction cost and the replacement cost as of November 15, 1933, respectively, of the tube, buildings, etc., within the United States, excluding the cost of the land, were as follows:

| | On Property of Detroit & Canada Tunnel Co. | In Streets and River Bed | Total |
|---|---|---|---|
| Original cost: Tube | $ 362,382.01 | $2,603,028.16 | $2,965,410.17 |
| Buildings, plaza improvements and stationary machinery | 713,199.92 | | 713,199.92 |
| Total | $1,075,581.93 | $2,603,028.16 | $3,678,610.09 |
| Replacement cost: Tube | $ 260,593.77 | $1,707,183.83 | $1,967,777.60 |
| Buildings, plaza improvements and stationary machinery | 482,151.99 | | 482,151.99 |
| Total | $ 742,745.76 | $1,707,183.83 | $2,449,929.59 |

Including the cost of the land and certain items of personal property not assessed, such as motor coaches used by the Company for the transportation of passengers, the total cost of land, the improvements, and equipment on the American side, was $5,527,934.33.

The project was financed through the issue of $8,500,000 first mortgage 6 per cent. sinking fund gold bonds due May 1, 1953, and $8,491,000 twenty-year 6½ per cent. convertible sinking fund gold debentures due May 1, 1948—$17,000,000 in round numbers. (Among other liabilities were 1,690,000 shares of no-par value stock issued against the $5,500,000—declared value—of franchise, options, etc.)

The Ambassador Bridge was opened at about the time the tunnel was ready for use and two ferries also offered competitive passenger and vehicular transportation across the river.

The general economic depression commencing late in 1929 seriously impaired the value of the property as well as its earning capacity.

On July 8, 1932, the Bank and Quotation Record, a concededly well-recognized financial publication, quoted the market value of the outstanding bonds, debentures, and stock of the Company at $1,181,025.00, an appalling shrinkage.

Both the master and the court found that after making proper provisions for depreciation, amortization, corporation taxes, income taxes, property taxes, and all other applicable elements, the net earnings of the property for the year 1931 were $153,126.58; for 1932, $135,507.76; for 1933, $103,014.36; and for 1934, $118,223.37.

The Company charged a fixed schedule of rates for passenger cars and trucks and operated a bus line between terminals for "foot passengers." Fares were adjusted by the Company itself to meet competition. They were revised as of January 1, 1934, and in the opinion of the receiver resulted in the increase of operating revenues of approximately 7½ per cent. over the previous year. He concluded his report for the year 1934 with the opinion "that the competitive position of the tunnel company is considerably improved and while the rates of fare are too low for the service rendered they appear to be all that can be charged as long as the present rates are in effect on our competitors' facilities."

Interest on funded debt has been in default since May 1, 1932. On December 30, 1934, the amount in arrears on these bonds and debentures was $650,000. The Company had likewise been unable to set up reserves for depreciation of tunnel and appurtenances, or to amortize its land, rights, franchises, etc. At the time of this report of December 30, 1934, these accrued reserves, unmet, amounted to $1,933,856.87. The income account as given for 1934 completely ignored these items which would have been cared for in a healthily functioning business.

The first tax assessment upon the Detroit portion of the completed tunnel was for the year 1931 and amounted to $4,383,240. This was intended as "the true cash value." It was arrived at by fixing a cash value for the land, estimated upon a square-foot basis, and adding thereto the construction cost of the buildings and improvements on the property of the Company and underneath the city owned streets and river bed. As reflected by the Company's books, using the 1931 assessment as a basis, the assessments for 1932, 1933, and 1934 were arrived at by deductions for depreciation of 2 per cent. per annum and two horizontal reductions applied to all property in Detroit and Wayne County of 13 per cent. for 1931 and 1932, respectively.

As a result the assessments upon the property on the Detroit side of the river stood as follows:

| | |
|---|---|
| 1932 | $3,699,450.00 |
| 1933 | $3,610,210.00 |
| 1934 | $3,542,530.00 |

It is these assessments which are in dispute here and which appellees deem grossly excessive in view of the earnings of the Company for the years involved. Each one was duly protested by the receiver before the Board of Assessors, the Board of Review, the Wayne County Board of Review, and the Michigan State Tax Commission, but each was confirmed by those authorities without change.

The gist of appellees' complaint is that the assessments were grossly excessive, discriminatory, unlawful, invalid, unjust, and unconstitutional; that the property was not assessed at its true cash value within the meaning of the Fourteenth Amendment; of article 10 of the Constitution of Michigan; of section 3412 of the Compiled Laws of Michigan 1929; and section I, chapter II, title VI, of the Charter of Detroit.

Appellees further urged that the Company was a public utility and in support of this position it cited numerous public agen-

cies which were required to approve the plans for the tunnel and which regulated its operation as well as certain regulations it was compelled to comply with. Upon this assumption appellees insisted that the assessors had used a wrong basis; that they should have taken into account the earning capacity of the Company, pointing out in one of the petitions that the taxes as assessed amounted to 41 per cent. of gross earnings.

It is clear that if the assessments made by the taxing authorities were so grossly excessive as to be unreasonable, and were arrived at by the adoption of fundamentally wrong principles, they were not final and a federal court of equity has power to grant relief because taxation based upon such valuations deprives the Company of its property and denies it the equal protection of the law. Great Northern Ry. Co. v. Weeks, 297 U.S. 135, 139, 56 S.Ct. 426, 428, 80 L. Ed. 432; Cumberland Coal Co. v. Board, 284 U.S. 23, 25, 52 S.Ct. 48, 49, 76 L.Ed. 146; Greene v. Louisville & I. R. R. Co., 244 U.S. 499, 507, 37 S.Ct. 673, 61 L.Ed. 1280, Ann.Cas.1917E, 88; Johnson v. Wells Fargo & Co., 239 U.S. 234, 244, 36 S.Ct. 62, 60 L.Ed. 243; Raymond v. Chicago T. Co., 207 U.S. 20, 37, 28 S.Ct. 7, 52 L.Ed. 78, 12 Ann.Cas. 757; Cummings v. Nat. Bank, 101 U.S. 153, 163, 25 L.Ed. 903; Conn v. Ringer, 32 F.(2d) 639, 641 (C.C.A.6); Taylor v. Louisville & N. R. Co., 88 F. 350, 361 (C. C.A.6); Pleasant v. Missouri-Kansas-Texas R. Co., 66 F.(2d) 842, 845 (C.C.A.10); Louisville & N. R. Co. v. Bosworth, 230 F. 191, 211 (D.C.); Cumberland Pipe Line Co. v. Lewis, 17 F.(2d) 167 (D.C.); Trustees of Cincinnati Southern Ry. v. Guenther, 19 F. 395, 398 (C.C.).

In making the original assessments in 1931 the assessors purported to act under the authority of the provisions of the Constitution and Statutes of Michigan and the Detroit City charter, above cited, which required them to assess all property, real and personal, at its true cash value.

Section 3415 of the Compiled Laws of Michigan of 1929 provides: "3415. The words 'cash value,' whenever used in this act, shall be held to mean the usual selling price at the place where the property to which the term is applied shall be at the time of assessment, being the price which could be obtained therefor at private sale, and not at forced or auction sale. In determining the value the assessor shall also

consider the advantages and disadvantages of location."

The City charter provides that, "all real and personal property within the city subject to taxation by the laws of the State shall be assessed at its true cash value by the Board of Assessors herein provided. * * *" Detroit City Charter (Ed.1935) § 1, p. 157.

In making the 1931 assessment the assessors started with a close approximation to the actual cost of the land and buildings and the tunnel. Thereafter it made certain deductions uniform for all property in Detroit and a 2 per cent. per annum deduction for depreciation. Little, if any, account was taken of the depression (see Great Northern Ry. Co. v. Weeks, supra, 297 U.S. 135, at page 149, 56 S.Ct. 426, 433, 80 L.Ed. 432) and other factors which brought the earning capacity of the Company to a ridiculously low figure when compared with the cost of its facilities.

The assessors and reviewing boards deliberately refused to take into consideration the earnings or earning power of the tunnel property as factors in determining its cash value for taxation purposes. Thus, the most fundamental element in value was set at naught. The terminals might have had some value at a private sale for other purposes. See Comp.Laws 1929, § 3415. There is a possibility that a purchaser might have sought to buy them for factory buildings, apartment or storage houses, or some such use, but it is inconceivable that the tunnel property as a unit could have been put to any other use or would have any salability or value except for the one purpose for which it was constructed.

It was stipulated that: "The buildings and improvements which have been constructed by the Tunnel Company on Tunnel Company and City property are of such a character as to be capable of profitable use for one purpose only, namely, as a part of the entire vehicular tunnel as now operated."

In Adams Express Co. v. Ohio State Auditor, 166 U.S. 185, 222, 17 S.Ct. 604, 606, 41 L.Ed. 965, it was said: "Business men do not pay cash for property in moonshine or dreamland. They buy and pay for that which is of value in its power to produce income, or for purposes of sale."

A prospective purchaser would consider not only the property and construction costs but would make a more material inquiry as

to cost of operation and maintenance as well as "what amount of business has it done, is it doing, and what is it likely to do?" See Trustees of Cincinnati Southern Ry. v. Guenther, supra, 19 F. 395, 400. His ultimate inquiry would naturally be, what amount of profit or net income he might reasonably expect to derive from the use of the property as a tunnel? See Cleveland, etc., Ry. Co. v. Backus, 154 U.S. 439, 446, 14 S.Ct. 1122, 38 L.Ed. 1041; Chicago & N. W. Ry. Co. v. Eveland, 13 F.(2d) 442, 448 (C.C.A.8). The company would be expected to disclose every element pertinent to the inquiry.

There is no evidence that the taxing authorities were guilty of any actual fraud but we think that, in persistently adhering to cost less depreciation as a formula for arriving at "true cash value" and in ignoring the capitalized income method adopted by both the master and the court, they proceeded upon a fundamentally wrong basis. There had been a devastating decline in the value of the Company's securities. It was not earning enough to pay the interest on its bonds and debentures or to make any of the allowances for depreciation and amortization which good business practice would have required. Its income was readily determinable. By section 6 of the ordinance granting its franchise its tolls were apparently fixed by the Company itself "on a basis of a fair and reasonable return on the fair value of all property, improvements * * *" subject to rules and regulations of Congress, the Interstate Commerce Commission, the State of Michigan, the City of Detroit, and the Dominion of Canada. The tolls were all "the traffic would bear" in view of the competitive bridge and ferries. It is not material to determine whether the tunnel had ever been designated by any authority as a public utility. There is little doubt that it was such as a matter of fact. It offered its facilities to all comers and made them available at all hours of the day and night. See United Fuel Gas Co. v. Railroad Comm. of Kentucky, 278 U.S. 300, 309, 49 S.Ct. 150, 152, 73 L.Ed. 390.

■ The capitalization of net income method of valuation for tax purposes of such similar utilities as ferries, bridges, canals, toll roads, and pipe lines is not unusual. Cumberland Pipe Line Co. v. Lewis, 17 F. (2d) 167, 168 (D.C.); State v. Virginia & T. R. R. Co., 23 Nev. 283, 294, 46 P. 723, 35 L.R.A. 759. The principle has been recognized even in Michigan (see Alpena Power Co. v. Caledonia Township, 194 Mich. 622,

161 N.W. 829), and we think that it is peculiarly applicable here because of the certainty with which a just valuation could be arrived at.

Upon this principle both the master and the court capitalized the net earnings for the four years, 1931 to 1934, inclusive, adding thereto $35,000 for the present value of possible future increased earnings at 7 per cent., and found a total valuation of $848,-937.50. As indicated above, we find no reason to disagree with the result as a basis for the injunction. The amount of $50,-000 having already been paid, the court found an additional sum of $14,666.10 to be due and ordered it paid by the trustee in the reorganization proceedings and enjoined the collection of any and all taxes in excess thereof.

The injunction was based upon the authority of such cases as Cummings v. Nat. Bank, supra, 101 U.S. 153, 25 L.Ed. 903; Raymond v. Chicago T. Co., supra, 207 U. S. 20, 37, 28 S.Ct. 7, 52 L.Ed. 78, 12 Ann. Cas. 757; Taylor v. Louisville & N. R. Co., supra, 88 F. 350, 369; Cottle v. Union Pac. R. Co., 201 F. 39, 43 (C.C.A.8); and Cumberland Pipe Line Co. v. Lewis, supra, 17 F.(2d) 167, 172.

■ It follows from what has been said that the decree, in so far as it enjoins the collection of any more taxes based upon the assessments here in controversy, is affirmed. But the decree goes further. It provides (par. 6) that, upon payment of the amounts ordered to be paid, the Company and its receiver and trustee shall be forever released and discharged from any and all liability on account of the taxes for the years in controversy; and it enjoins (par. 9) the collection of any ad valorem taxes on the property other than the amounts ordered to be paid. The effect of these provisions is to fix definitely the amount of taxes that might be legally exacted for the years involved. This was no function of the court. See Rowley v. Chicago & N. W. Ry. Co., 293 U.S. 102, 111, 55 S.Ct. 55, 59, 79 L.Ed. 222; In re Lang Body Co. (John J. Boyle, Treas., v. John C. Hipp, Trustee) (C.C.A.) 92 F.(2d) 338, decided October 11, 1937. The decree should have left the taxing authorities free to make a new assessment if they could and wished to do so. Rowley v. Chicago & N. W. Ry. Co., supra, 293 U.S. 102, at page 112, 55 S.Ct. 55, 59, 79 L.Ed. 222; Great Northern Ry. Co. v. Weeks, supra, 297 U.S. 135, at page 153, 56 S.Ct. 426, 435, 80 L.Ed. 432.

Paragraph 11 of the decree provided: "11. That this Decree shall be held to be without prejudice to the authority of the respondent taxing authorities or any other administrative body, *if there shall be any such authority under the law,* again to assess the properties of the defendant company for the said three years *in accordance with the terms and conditions of this Decree and the principles and findings set forth in the Findings of Fact and Conclusions of Law filed herein.*" (Italics ours.)

This paragraph attempted to follow the procedure pointed out in the Rowley and Weeks Cases but is faulty in that it restrained the taxing authorities from fixing any higher valuations than those the court itself had established as a basis for its injunction, thus again constituting itself the ultimate assessor. The decree, as affirmed, is remanded, with directions to revise Paragraphs 6, 9, and 11 to eliminate the defects indicated, and so revised, to declare that it is without prejudice to the right of the taxing authorities if any they have, again to assess the property for the years involved.

It is conceivable that a capitalization on a different basis than that used by the District Court (7 per cent.) as the basis for its injunction might not be invalid and that the assessors *might reasonably differ from the* court as to the amount to be added "for the present value of possible future increased earnings." It is also conceivable that the land and buildings valued purely as real estate for business purposes apart from the tunnel might well have an actual true cash value higher than the capitalized earning value of the entire property. These are but elements of the controversy which the taxing authorities could and should consider and which are foreclosed to them under the present form of the decree.