The People *ex rel.* The Albany and Greenbush Bridge Co. agt. Weaver.

## SUPREME COURT.

THE PEOPLE *ex rel.* THE ALBANY AND GREENBUSH BRIDGE COMPANY agt. WILLIAM J. WEAVER and others, THE BOARD OF ASSESSORS OF THE CITY OF ALBANY and others.

*Taxes and assessments — rule which assessors must observe in valuing property — Oath to an assessment-roll which will render an assessment void.*

Where the statutes provided that assessors in valuing property must assess it "at its full and true value, as they would appraise the same in payment of a just debt due from a solvent debtor," and upon the completion of their roll they are required to swear that they have observed that rule in the valuation of all real estate.

Where a party seeks by *certiorari* to reduce an assessment upon his property, and in return to the writ the assessors do not pretend that they have obeyed and followed these provisions of the statutes, but they declare that "the valuation made by them of the property is just and fair, and at as fair a rate and just proportion as that of other property assessed by them, according to the best of their knowledge and belief:"

*Held,* that, as they have not certified to the court that they have followed the statute, their judgment should have no influence upon the decision.

In determining the value of bridge property in the mode which the statute directs, the true criterion of such value must be its earning capacity, not its original cost.

*Albany Special Term, September,* 1884.

*Parker & Countryman,* for the relator.

*Henry Smith,* for the respondent.

WESTBROOK, *J.*—The relator seeks by *certiorari* to reduce the assessment upon its property located within the city of Albany, consisting of the westerly end of the iron highway and foot bridge across the Hudson river, and the westerly approach to the bridge, including the gate-house, ferry slip, &c. The original assessment fixed the valuation of the property at the sum of $280,000. Upon the application of the relator, the assessors, after a hearing, reduced such valuation to the sum of $225,000. The relator claims that the valuation is still excessive, and the case is submitted upon the petition, the return, and the evidence taken before the assessors.

The statutes of this state are explicit and clear as to the rule which the assessors in valuing property must observe. They must assess it " at its full and true value, as they would appraise the same in payment of a just debt due from a solvent debtor " (2 *R. S.* [*7th ed.*], 992, *sec.* 17); and upon the completion of their roll they are required to swear that they have observed that rule in the valuation of all real estate (*Same vol., page* 994, *sec.* 7). In their return to the writ, the assessors do not pretend that they have obeyed and followed these provisions of the statutes, but they declare that " the valuation made by them of the property of said bridge company is just and fair, and at as fair a rate and just proportion as that of other property assessed by them, according to the best of their knowledge and belief."

In *Beach* agt. *Hayes* (58 *How.*, 17), the judge writing this opinion held that an oath to an·assessment-roll which did not follow the statute, and which in substance stated a valuation upon a principle similar to that adopted by the assessors, according to their return in this case, renders the assessment void. It is not at all important that the assessors regard their assessment as " just and fair," and that it is " at as fair a rate and just proportion as that of other property," the question is: has it been assessed at its full and true value, as they would appraise the same in payment of a just debt due from

The People *ex rel.* The Albany and Greenbush Bridge Co. agt. Weaver.

a solvent debtor? It does not appear but that the assessors regarded some other rule as "just and fair," and it is impossible without information to know what is meant by the expression "at as fair a rate and just proportion as that of other property."

There is no need, however, of speculation as to their meaning. They have not certified to the court that they have followed the statute, and their judgment can therefore have no influence upon the decision. In determining the value of the property of the relator in the mode which the statute directs, it is an evidently sound proposition that the true criterion of such value must be its earning capacity. A dwelling-house or a farm may have, by reason of advantages of location for beauty or for health, or the expenditure thereon of large sums of money to gratify the taste or to conduce to the comfort of the owner, a greater value than its earning capacity, but property of the description of that owned by the relator, built exclusively to earn money for its owners, must be judged by its ability to accomplish the purpose for which it was constructed. A creditor to whom a solvent debtor applies to pay a debt by turning over property of this character would naturally inquire, "what will it produce to me?" A rosy description of its future, based upon the completion of other enterprises not yet begun, would not be apt to lead him from the examination of what it was producing to its owner at the time of the proposed sale. To all arguments founded upon future prospects he would be apt to reply, "all this is conjecture; if other improvements are in process of erection, that fact might have some weight, but so long as they are unbegun and not even contemplated, they can have no influence."

Precisely this argument applies to the present case. The bridge of the relator was constructed for the purpose of a railroad bridge as well as for the purpose of accommodating foot passengers and carriages. To accomplish the object of its construction, to wit, the accommodation of railway companies, the structure was made very much heavier and

stronger than it would have been made if intended only for use by foot passengers and by carriages and wagons. The strength of the structure added very largely to its cost, but unfortunately for its projectors the line of railroad which it was to accommodate has been abandoned, and its only use up to the present time has been for purposes which were secondary to its main object. So far as the testimony shows there is now in existence no line of railroad which the bridge would accommodate, and the construction of none has as yet been proposed. Under such circumstances it would be unjust to base the valuation of the property of the relator upon its actual cost, for such cost has as yet added nothing to its earning capacity, and whether or not it will do so in the future is as yet entirely problematical.

If the advantage to be attained in the construction of the bridge, to wit, its use by railroad corporations, shall ever be attained, it will then be proper in judging of the value of the structure, to take that fact into consideration, but until such event occurs a valuation based thereon is entirely speculative, and should not and ought not to control at the present time. That in valuing the property of the relator the assessors should have been largely controlled by the earning capacity of the property assessed, is sound, is apparent, not only on reason, but from an express adjudication of this court at the general term of this department in *People* agt. *Pond* (13 *Abb. N. C.*, 6), which decision was followed and adopted by myself in the recent case of *The People on the Relation of the Wallkill Valley Railroad Company* agt. *Nathan Keator and others, Assessors of the Town of Rosendale,* and such rule will therefore be adopted in the present case without any further discussion.

A reference to the testimony given upon the hearing before the assessors relating to the cost of the bridge and its approaches, and that which shows the cost at which the property could be reproduced at the present time, shows that the assessors in valuing such property were governed by the cost

of the structure rather than by its earning capacity. In so doing they disregarded the adjudication of this court at general term, and for that reason their judgment of value cannot be upheld.

The evidence given by A. Bleecker Banks, the president of the relator, is entirely uncontradicted. In his testimony he gave the total cost of the structure with its approaches, and also its gross and net receipts from the opening on January 26, 1882, up to and including September 30, 1883. After detailing the cost of the structure, with its approaches and its income, he says: "That the present true and full value of said bridge, including the approaches, as the same would be applied in the payment of a just debt from a solvent debtor, does not exceed, in deponent's judgment, the sum of $255,000.

"That the center of the channel of said Hudson river at said bridge is at the center of the bridge proper, and where the pivot pier is located, leaving only about four-tenths of the entire structure, including approaches, within the limits of the city of Albany and assessable in said Fourth ward.

"That the other six-tenths of said bridge property is assessed on the opposite side of the river, in the town of Greenbush. That the present value of said bridge and landed property lying within the city of Albany does not exceed $110,000, and the amount of the assessment for said bridge and landed property in the Fourth ward of said city should, therefore, not exceed the sum of $110,000.

There was no evidence given to the assessors which in any way was in conflict with it. On the contrary, the evidence of Alfred P. Boller, the engineer under whose superintendence and plans the structure was erected, is corroborative thereof, and the testimony as to its actual value within the city of Albany being only $110,000, is fully corroborated by the evidence of the receipts from its use.

It is true that the evidence given by Mr. Banks was not necessarily controlling upon the assessors. They could still exercise their own judgment, founded upon observation of

the property and any reliable information as to its earning capacity. There is, however, absolutely nothing in the return from which it can be seen that they disregarded the evidence of Mr. Banks because he untruly stated either the cost or the earnings of the property. If they had unequivocally stated to the court that they had valued the property as the statutes directed them to value it, their judgment would have had great, and perhaps controlling weight; but when they do not so state to the court, but, on the contrary, declare " that the valuation made by them of the property of said bridge company is just and fair," without any statement by them as to the rule adopted in arriving at a just and fair valuation, and when the court can see from the sum at which the property has been valued and the cost of the structure (as the court can see in this case) that such valuation has been largely controlled by the cost, the valuation made by them cannot be upheld, and must be reduced to the sum fixed by such uncontradicted evidence, to wit, $110,000.

As there is nothing shown to impeach the good faith of the assessors, no order charging them with the costs of this proceeding will be made.