PARSONS et al. v. DETROIT & CANADA
TUNNEL CO. et al.
No. 5356.

District Court, E. D. Michigan, S. D.
July 31, 1936.

Sherwin A. Hill and Charles E. Lewis, both of Detroit, Mich., for petitioner.

Raymond J. Kelly and Walter Barlow, both of Detroit, Mich., for City of Detroit, and Albert E. Cobo, treasurer.

MOINET, District Judge.

On petitions filed herein the receiver of the defendant company asserts the illegality of ad valorem real property tax assessments against the defendant's property for the years 1932, 1933, and 1934 because, principally, of erroneous methods of valuation, gross excessiveness, and unlawful discrimination, in violation of the due process and equality clauses of the Fourteenth Amendment to the Federal Constitution. The court is asked to determine the amount justly due on account of said taxes and to restrain the collection of such portion of the taxes levied for said years as shall be found to be in excess of the amounts found herein to be justly owing therefor.

The defendant, Detroit & Canada Tunnel Company, was incorporated on August 25, 1927, under the General Corporation Laws of Michigan, for the general purpose of building, owning, and operating (in conjunction with its wholly owned subsidiary, the Detroit & Windsor Subway Company, a Canadian corporation), a vehicular tunnel or subway underneath the Detroit river between Detroit, Mich., and Windsor, Ontario. On April 30, 1932, the petitioner was appointed as receiver for the defendant company in this creditors' equity receivership suit. On March 7, 1935, possession and control of the defendant's property was placed by this court in the hands of the petitioner as trustee in reorganization proceedings under section 77B of the Federal Bankruptcy Act (11 U.S.C.A. § 207).

At the time of the appointment of the petitioner as receiver of the defendant company on April 30, 1932, the protest of the tunnel company against the 1932 real property tax assessment was pending with the board of review. The receiver, after exhausting the remedies by proper appeal before the board of review and state tax commission, filed petition herein for the purposes aforesaid. Similar procedure was followed by the receiver with reference to tax assessments for the years 1933 and 1934. An order was entered herein permitting the trustee in the reorganization proceedings to intervene in these proceedings as a co-petitioner with the receiver. In pursuance of stipulation and agreements of record between the parties, the petitions and answers pertaining to the taxes for the three years 1932, 1933, and 1934 have been consolidated for hearing and determination herein. Extensive proofs, briefs, and arguments were presented to a special master, and his comprehensive report and supplemental report have been approved and adopted by the court; all exceptions thereto being overruled after consideration of briefs and arguments of counsel.

It is the claim of the petitioner that the business and property of the defendant company is in the nature of a single purpose, public utility, so called; that as to such property the capitalized income method of ascertaining true cash value, either alone or in combination with the stock and bond method, so called, is a fundamentally essential method of valuation under the circumstances here involved; that the assessing authorities, in valuing the property for the three years in question, failed and refused to give any consideration or weight to the capitalized income method; that they arrived at their valuations solely upon the basis of original or reproduction cost, less depreciation; that in so doing they adopted a fundamentally erroneous principle or method; that the resulting valuations were more than 400 per cent. greater than the level of property valuations generally, and were so grossly excessive and the persistent and systematic action of the assessors so arbitrary as to be the equivalent of fraud; and that under these circumstances the assessments were in violation of the Fourteenth Amendment.

It is also claimed by the petitioner that the underground portion of the tunnel structure, which is built in city-owned property under a franchise granted to the tunnel company for that purpose, should have been assessed as personal property under the provisions of sections 3396 (as amended by Act No. 94 of 1931) and 3402 of the Compiled Laws of Michigan of 1929, whereas the assessors included it in the valuation of the real estate owned by and assessed to the defendant company; that as personal property this portion of the tunnel would have been subject to the superior lien of the general mortgage of the company, and, under certain circumstances, the tax claim against this portion of the tunnel would have relegated to the status of a general claim.

The respondent taxing authorities admit in their answers (and in an agreed state-

ment of facts) that they arrived at the valuation of the property in question in the manner complained of by the petitioner, but it is their contention that under Michigan statutes the action of the administrative officers in arriving at true cash value is final and is not subject to review by the courts under any circumstances; that the property in question is not a public utility and that the capitalization of net earnings method of valuation is therefore not applicable; that these proceedings are barred by the provisions of Michigan and federal statutes which provide that no injunction shall issue to stay proceedings for the assessment or collection of taxes, and by a section of the franchise given to the tunnel company by the city of Detroit in which it was agreed that nothing contained therein should be construed as a waiver of the right of the city of Detroit to impose taxes upon the property of the tunnel company. They deny that any portion of the tunnel is taxable as personal property.

The pertinent facts are not in controversy, and have, to considerable extent, been agreed upon by stipulation or conceded by admissions in the pleadings.

The tunnel property consists of a subsurface tunnel tube constructed of steel and masonry passing underneath the Detroit river and adjacent land and inclosing a two-way road which emerges on the Detroit and Windsor sides of the river upon terminal properties which accommodate specially designed ventilation buildings, customs and immigration buildings, toll booths, immigration offices and inspection rooms, and other incidental facilities in connection therewith.

Construction of the tunnel was begun in 1928. It was completed and opened for traffic on November 3, 1930, and has been operated continuously ever since by the defendant company until April 30, 1932, and thereafter by petitioner as receiver and trustee.

The sole use to which this tunnel property can be and has been devoted is as a highway through which vehicles may be driven between Detroit and Windsor. Its value varies with, and depends entirely upon, the profitableness of its use. It cannot be now used, and cannot be changed so as to be capable of use, for any other purpose having any possible connection with value, whether a going concern value, scrap value, sentimental value, æsthetic value, or other value, either present or future.

It is conceded by the respondents (stipulated facts, Exhibit 16, par. 14; 1934 petition, par. 13; city answer of 1934, par. 5; county answer of 1934, par. V) that the tunnel properties in question are so designed and of such a character as to be usable for a single purpose only.

The facts relating to the "public utility character" of the tunnel properties are as follows: (See stipulated facts, Exhibit 16, pars. 1, 2, 3, 4, 5, 6, and 7, and the pleadings, 1934 petition, par. 13; city answer 1934, par. 5, and 1934 Wayne county answer, par. V.)

The tunnel company was originally organized (under the purposes stated in its articles of association) to conduct a transportation business by means of a vehicular tunnel underneath the Detroit river between Detroit and Windsor. The General Corporation Act of Michigan, so called (Act No. 84, Public Acts 1921), under which the defendant tunnel company was incorporated, gave to highway tunnel companies the power to condemn real estate for right of way purposes. Railroad companies and railroad tunnel companies (as distinguished from highway tunnel companies) and certain other utilities were required to incorporate under special acts. In acting upon the application of the company for permission to sell securities, the Michigan Public Securities Commission, by formal order, found that the purpose of the company was to conduct a general transportation business as a common carrier of passengers and goods through its tunnel. From the time the tunnel was opened to the present date, it has been used as a passageway for privately owned vehicles and for the transportation of bus passengers in busses owned and operated by the company at toll and fare rates prescribed by the Canadian railway board; no other regulatory body having asserted jurisdiction. The use of the tunnel for privately owned vehicles is held open night and day to all persons indiscriminately at the toll rate promulgated and published from time to time by the company in accordance with regulations of the Canadian railway board. The use of the busses operated by the company carrying passengers through the tunnel is also open to the public indiscriminately at prescribed and published toll rates, and the busses have been operated at regular intervals and between fixed termini at all times night and day. In the construction, maintenance, and operation of the tunnel, the company and

its Canadian subsidiary are subject to the control of various regulatory authorities with respect to the safety, efficiency, and convenience of operation and the reasonableness of service charges, as follows:

(1) Approval of plans by Canadian Governor-in-Council, Canadian customs authorities, Canadian immigration authorities, Canadian railway board, Canadian department of external affairs, and Canadian department of marine and fisheries.

(2) Maintenance of offices and warehouses for officers of Canadian department of national revenue, immigration and colonization.

(3) Inspection certificate of Canadian engineers as to safety and preservation of tunnel furnished annually to master of public works.

(4) Indemnity bond to city of Windsor against construction damage.

(5) Notice of accidents to Canadian railway board.

(6) Conformity with plans approved by United States Secretary of War (Permit issued November 29, 1927, under Rivers and Harbors Appropriation Act 1899, § 10 [33 U.S.C.A. § 403]).

(7) Regulation and approval of tolls and fares and loading and unloading facilities by Canadian board of railway commissioners (Railway Act, §§ 312 to 366).

(8) Indemnity bond to city of Detroit against construction damage.

(9) General regulations of board of railway commissioners of Canada for safety of public (Railway Act, § 287).

(10) Filing of schedules and time tables with board of railway commissioners of Canada (Railway Act, § 302).

(11) Approval by board of railway commissioners of Canada of telegram and telephone leasing charges (Canadian Railway Act, § 375).

(12) Regulation of tolls and fares and compliance with engineering and traffic requirements of city of Detroit (Detroit ordinance).

(13) Approval of securities by Michigan Public Utilities Commission.

(14) Preference to city of Detroit as to contracts for operation of busses or street cars through tunnel (condition of ordinance).

(15) Mutual transfer fares and tolls in case of operating connection with De-troit municipal transportation system (condition of ordinance).

(16) Approval by Detroit city authorities of construction plans (conditions of ordinance).

(17) License from the President of the United States (November 11, 1929).

The defendant company and its receiver and trustee have at all times operated the tunnel efficiently, economically, and properly, in an effort to increase its income and to reduce its expenses to the utmost extent possible.

The block of land upon which the Detroit terminal buildings and tunnel entrance are located belongs to the defendant company. The land underneath which most of the American subsurface portion of the tunnel is constructed (in Randolph street and the river bed) belongs to the city of Detroit, and the right to so use such land has been granted to the tunnel company and its successors by the city.

The terminal buildings on the company-owned property are firmly attached by solid masonry to the subsurface tunnel tube structure embedded in the soil beneath city-owned Randolph street and the city-owned river bed.

All right, title, and interest of the tunnel company in the underground portion of the tunnel (as well as all of the property belonging to it) was mortgaged and pledged by the tunnel company to Guardian Trust Company of Detroit as trustee under the terms and provisions of an indenture of first mortgage dated May 1, 1928, and recorded with the city clerk of the city of Detroit, Mich., in the Book of Chattel Mortgages, Conditional Sales and Bills of Sale, on July 25, 1928, under No. 277102; said indenture of first mortgage also being recorded with the register of deeds for Wayne county, Mich., on May 28, 1928, in Liber 2142 of Mortgages at page 4. This mortgage has been duly renewed from year to year to the present time as required by law for the renewal of chattel mortgages.

It does not appear that this or any similar property has been sold or offered for sale since it was constructed or that any price has been offered for it at any time.

The original construction cost and the present replacement cost, respectively, of the buildings, tunnel tube, and other improvements on the tunnel-owned and city-owned portions of the tunnel property with-

in the United States (excluding bare land values) is as follows (Exhibit 4).

Under Michigan Local Act No. 378 of 1879, property assessments are made by the

| Original Cost | On property of Detroit & Canada Tunnel Company | In Streets and River Bed | Total |
|---|---|---|---|
| Tube | $ 362,382.01 | $2,603,028.16 | $2,965,410.17 |
| Buildings, Plaza improvements and stationary machinery | 713,199.92 | .......... | 713,199.92 |
| | 1,075,581.93 | 2,603,028.16 | 3,678,610.09 |
| Replacement Cost Tube | 260,593.77 | 1,707,183.83 | 1,967,777.60 |
| Buildings, Plaza improvements and stationary machinery | 482,151.99 | .......... | 482,151.99 |
| | $ 742,745.76 | $1,707,183.83 | $2,449,929.59 |

The original cost of land on the American side was $1,647,199.12. Adding this to the original total cost of improvements, machinery, and equipment, gives an original cost of land improvements and equipment (including nonassessable motor coaches and other items of personal property) on the American side of $5,527,933.34 (Exhibit 17).

Late in 1929, shortly before the tunnel was completed and opened for traffic, the general economic collapse occurred, causing fundamental changes in conditions affecting traffic between Detroit and Windsor. This, coupled with other factors, seriously impaired the earning capacity and value of the tunnel property and continued to the present time and are relatively permanent in nature. Average annual net operating income from the entire tunnel property in the United States and Canada for the period November 3, 1930, to December 31, 1934, after reasonable provisions for amortization, depreciation, and taxes, was approximately $127,500. The total city, county, and state taxes complained of, as assessed against the American portion of the tunnel alone, were:

1932 ................ $131,628.13
1933 ................ $107,085.45
1934 ................ $106,996.19

The deficiency in the demonstrated earning power of the tunnel property resulted in the default on May 1, 1932, in the payment by the company of interest requirements on its bonded indebtedness.

Detroit board of assessors for city, county, and state taxes. Under the State Constitution and statutes and Detroit city charter, they are required to assess all property, real and personal, at its "true cash value." Constitution, art. 10, § 7; Mich.C.L.1929, § 3412; Detroit City Charter, 1935, § 1, P. 157. The decision of the reviewing state board is declared to be "final." C.L.Mich.1929, § 3547.

It is provided by section 3415 of the Compiled Laws of Michigan of 1929 that the words "cash value" shall be held to mean the usual selling price at private sale at the place where the property to which the term is applied shall be at the time of assessment, and that in determining the value the assessors shall consider the advantages and disadvantages of location. Sections 3555 to 3572 require that the property of certain rail carriers and of telephone and telegraph companies be assessed by the Michigan state tax commission and a specific tax paid thereon in lieu of other taxes. Highway tunnel companies and other public utility companies are not included. The Detroit & Canada Tunnel Company is therefore not required to pay a specific tax to the state, but is subject to assessment under the General Tax Laws referred to above. Section 3396, as amended, requires the road or bridge of any transportation company or any other company not required to pay a specific tax to the state in lieu of other taxes to be assessed as personal property. Section 3402 requires all personal property

or buildings situated and being upon the lands of the state or of any other person or corporation not the owner of such buildings or personal property to be assessed as personal property.

Section 8 of Detroit City Ordinance No. 7-C (granting rights to the tunnel company underneath the streets and city-owned river bed) provides: "Nothing contained herein shall at any time be construed as amounting to a waiver of the right of the City of Detroit to impose taxes, either personal taxes or taxes upon the real estate, or upon the property of the Detroit-Ontario Subways, Inc., its successors and assigns, within the limits of the City of Detroit."

Section 3 of this ordinance also gave to the city of Detroit the right to purchase all property of the tunnel company within the United States upon one year's written notice to the company at the value of the property as determined within one year after the formal opening of the tunnel by a commission to be appointed at the instance of the parties. No notice by the city of its intention to exercise its right of purchase has ever been given nor have any steps been taken to have the property so valued for such purpose.

The exact method used by the assessors in arriving at the valuation of the property in question appears by agreed statement of facts (Exhibit 16, par. 10) and by admissions contained in the pleadings (1934 petition, par. 20 [21, 22, 23 and 24]; 1934 city answer, par. 7; 1934 Wayne County answer, par. VII). Without setting forth the full details, the facts in this connection are substantially as follows:

The first property tax assessment upon the Detroit portion of the completed tunnel was made in the spring of the year 1931. The assessors valued the property on the Detroit side of the river at $4,383,240. This included the value of land, buildings, and improvements both on the property of the tunnel company and underneath streets and city-owned river bed.

Corresponding valuations were made by the assessors during the following three years as follows:

1932 .............. $3,699,450.00
1933 .............. $3,610,210.00
1934 .............. $3,542,530.00

These amounts, which the assessing officers designated as the true cash value of the property in question, were arrived at by taking the original cost of the construction of the buildings and subsurface tunnel tube comprising the Detroit portion of the tunnel property, and, after deducting therefrom an allowance of 2 per cent. per annum for depreciation, adding thereto the relatively negligible value of the bare land on which the terminal buildings are located. Horizontal reductions of the assessments were then made in two successive years, amounting to 10 per cent. and 13 per cent., respectively; these same reductions being made with respect to the assessments of all property generally throughout the city of Detroit and county of Wayne.

When the first assessment was made in 1931, the tunnel had been in operation only a few months, and no data as to the earning capacity of the property from which a valuation upon the basis of the capitalization of its earning power might be arrived at was presented to the assessing officers. In 1932, 1933, and 1934, however, the company and its receiver presented detailed earnings data to the board of assessors, the board of review, and the state tax commission, claiming that this data should be taken into consideration in arriving at the true cash value of this property for tax assessment purposes. This information and claim was rejected by the assessing officers and administrative bodies, and they gave no consideration to the earnings or earning power of the tunnel properties in arriving at their valuations.

The assessing and reviewing officials also rejected the contention of the tunnel company that the subsurface portion of the tunnel which is embedded in property admittedly belonging to the city of Detroit underneath Randolph street and in the bed of the Detroit river should, for purposes of taxation, be treated as personal property, within the meaning of section 3396 (as amended) and 3402 of the Compiled Laws of Michigan of 1929, hereinafter discussed, and not as real property, as was done.

The position so taken by the assessing officers has been continually maintained by them at various hearings before the Detroit board of review and the Michigan state tax commission during the years 1932, 1933, and 1934. It appears from the record, including statements made by the assessing officers and from the assertion of their position as to the three years in question, that the taxing authorities have followed a systematic and intentional plan in this respect, and that it is their intention to continue in the future

with their present method and plan of valuing this property.

The Canadian portion of the tunnel, comprising approximately 55 per cent. of the whole, has been valued (under a similar statute, Exhibit 8), for assessment purposes, by the reviewing Canadian court, at $850,540, by use of the capitalized net earnings method (Exhibit 100). This may be compared with the 1933 assessor's valuation of the Detroit portion (45 per cent.) at $3,610,210.

The aggregate market value of all of the outstanding securities (bonds, debentures and stock) of the tunnel company is $1,181,125. Forty-five per cent. of this amount, this being the equivalent of the Detroit portion of the entire tunnel, would give a value to the property in question upon this basis of $531,506.25.

In order to pay the Detroit taxes complained of by the receiver, it would be necessary to take approximately 41 cents of every gross dollar collected from operations.

Assessed valuations of general business and residential property in Detroit and Wayne county, the market value of which has been established by actual sales, is on a level of approximately 102 per cent. of its actual market value (Exhibit 15 and testimony Witness Sexhauer). The assessed valuation of the tunnel company's property complained of is on a level of over 400 per cent. of its true cash value as arrived at by capitalizing its earning power.

It is necessary at the outset to consider the contention, strenuously advanced in behalf of the respondent taxing authorities, that under Michigan statutes the action of the administrative officers in arriving at true cash value is final and is not subject to review by the courts under any circumstances, and that these proceedings are barred, and the court herein is without jurisdiction for the specific reasons noted below.

■ It is a well-established principle of law that courts will not set aside, or interfere with, the exercise, by taxing authorities, of their power to assess property, nor review the methods by which, in the exercise of such power, they arrive at the values of property for tax purposes, except in cases clearly falling within recognized limitations of that power. It is, however, obvious that state and federal courts will not refuse to exercise the judicial power and duty to take jurisdiction and examine all proper factors entering into the actions of assessing officers, where it is clearly apparent there has been gross overvaluation of property resulting from their arbitrary or capricious action or from their adoption of a fundamentally erroneous principle or method of assessment or taxation, in violation of the due process or equality clauses of the Fourteenth Amendment to the Federal Constitution. Great Northern Railway Co. v. Weeks, 297 U.S. 135, 56 S.Ct. 426, 80 L.Ed. 532; Cumberland Pipe Line Co. v. Lewis (D.C.) 17 F.(2d) 167; Northern Pac. Ry. Co. v. Adams County (D.C.) 1 F.Supp. 163; Chicago & N. W. R. Co. v. Eveland (C.C.A.) 13 F.(2d) 442; People ex rel. Jamaica Water Supply Co. v. State Board of Tax Com'rs, 196 N.Y. 39, 89 N.E. 581; Cumberland Coal Co. v. Board of Revision, 284 U.S. 23, 25, 52 S.Ct. 48, 76 L.Ed. 146; Southern Ry. Co. v. Kentucky, 274 U.S. 76, 47 S.Ct. 542, 71 L.Ed. 934; Louisville & Nashville R. Co. v. Greene, 244 U.S. 522, 37 S.Ct. 683, 61 L.Ed. 1291, Ann.Cas.1917E, 97; Louisville & Nashville R. Co. v. Bosworth (D.C.) 230 F. 191; Mobile & O. R. Co. v. Schnipper (D.C.) 31 F.(2d) 587; Conn v. Ringer (C.C.A.6th) 32 F.(2d) 639; Sioux City Bridge Co. v. Dakota County, 260 U.S. 441, 43 S.Ct. 190, 67 L.Ed. 340, 28 A.L.R. 979; Pleasant v. Missouri, etc., R. Co., 66 F.(2d) 842; Risty v. Chicago, R. I. & P. R. Co., 270 U.S. 378, 46 S.Ct. 236, 70 L.Ed. 641.

In the recent case (February 3, 1936) of Great Northern Ry. Co. v. Weeks, 297 U. S. 135, 56 S.Ct. 426, 434, 80 L.Ed. 532, the Supreme Court, in holding that the failure of the assessing officers to give reasonable weight to shrunken operating income and security values of the railroad properties in question, rendering their action void in violation of the due process clause of the Fourteenth Amendment, said: "In cases such as this, courts are not permitted to weigh evidence of value. They may not substitute their opinions for the findings of assessing officers or boards. But, when the jurisdiction of the District Court is appropriately invoked, it is its duty to decide upon the merits of the taxpayer's claim that the assessment of his property was arbitrarily made and is grossly excessive." And, having found the assessment to be in plain violation of established principles governing property valuation, the case was remanded to the District Court, with directions to enjoin the collection of taxes levied in excess of what the court found to

be the true and full value of the properties in question upon the basis of established methods.

In Cumberland Pipe Line Co. v. Lewis (D.C.) 17 F.(2d) 167, at page 168, a statutory three-judge court, which included Judge Moorman, the Senior Circuit Judge of our Court of Appeals, said: "There is no room to claim that there was any fraud on the part of the commission in fixing such value. It acted in good faith. Plaintiff's case here, therefore, is whether it is clear that, in so doing, it adopted a fundamentally wrong principle. If the fixing of the value of plaintiff's capital stock at the sum complained of was the result of the adoption of such a principle, then the assessment deprived plaintiff (i. e., potentially) of its property without due process of law, in violation of the Fourteenth Amendment, and this court has jurisdiction to grant such relief."

In Cumberland Coal Co. v. Board of Revision, 284 U.S. 23, 25, 52 S.Ct. 48, 49, 76 L.Ed. 146, the Supreme Court used the following language, which is equally applicable here: "There is no question that the assessments under review were made pursuant to a deliberately adopted system. The case is not one of mere errors in judgment in following a proper method (Sunday Lake Iron Co. v. Wakefield, 247 U.S. 350, 352, 353, 38 S.Ct. 495, 62 L.Ed. 1154; Southern R. Co. v. Watts, 260 U.S. 519, 526, 43 S.Ct. 192, 67 L.Ed. 375), but one where the challenged discrimination resulted from a plan of assessment which was none the less systematic and intentional because of belief in its validity."

In Southern Railway Co. v. Com. of Kentucky, 274 U.S. 76, at page 82, 47 S.Ct. 542, 544, 71 L.Ed. 934, the court said: "If the method pursued in valuing property within the state is arbitrary, and the resulting valuation is grossly excessive, the tax must be condemned as in contravention of the due process clause of the Fourteenth Amendment."

As was pointed out by the court in Louisville & Nashville R. Co. v. Bosworth (D.C.) 230 F. 191, 197:

"From the case of C., B. & Q. Co. v. Babcock [204 U.S. 585, 27 S.Ct. 326, 51 L.Ed. 636] it is to be gathered that the courts are not limited to fraud as the only ground for overthrowing such an assessment; that if, in making it, the board adopted a fundamentally wrong principle in any particular, the assessment is void; and that in determining whether such a principle was adopted the court is to no extent affected by the judgment of the board. As to this it is free to substitute its judgment for that of the board. * * *

"If, then, it is the duty of the court to substitute its judgment for that of the assessing board, and to set the latter aside in making the assessment, if it has adopted fundamentally wrong principles, clearly it not only has the right, but it is its duty, to so do if it determines that the board has not followed the method prescribed by the statute under which it acted and from which it obtained its power to act at all."

In the language of the Supreme Court in Louisville & Nashville R. Co. v. Greene, 244 U.S. 522, 37 S.Ct. 683, 690, 61 L.Ed. 1291, Ann.Cas.1917E, 97: "The findings of an official body such as the Board of Valuation and Assessment, * * * are quasi judicial in their character, and are not to be set aside or disregarded by the courts unless it is made to appear that the body proceeded upon an erroneous principle or adopted an improper mode of estimating the value of the franchise, or unless fraud appears."

■ Within the principles established by the foregoing authorities, it is clear, under the circumstances presented, that the court herein has jurisdiction to hear and determine the issues involved.

■ It is clearly established that it is the right and duty of a receiver to bring to the attention of the court appointing him his bona fide claim as to the invalidity of taxes assessed against the property in his custody. Ex parte Chamberlain (C.C.) 55 F. 704; Ex parte Tyler, 149 U.S. 164, 13 S.Ct. 785, 37 L.Ed. 689.

■ The claim of the plaintiffs, William Barclay Parsons et al., against the defendant, Detroit & Canada Tunnel Company, in these equity proceedings in which the petitioner was appointed receiver, involved the sum of $13,851.45. It is stated in the respondent city's brief that this sum "was not sufficient in amount to give the Court jurisdiction to appoint a receiver in the premises." No authority whatever is cited in support of this statement. No such claim is made in the various answers of the city, nor in the city's exceptions to the master's reports. 28 U.S.C.A. § 41 (1), gives jurisdiction to District Courts in a suit in equity where the matter in controversy exceeds the sum of $3,000 and (1)

involves a federal question, or (2) is between citizens of different states. In case of a creditor's bill in equity for appointment of a receiver, the amount of the plaintiff's claim is "the amount in controversy." In re Metropolitan Railway Receivership, 208 U.S. 90, 28 S.Ct. 219, 52 L.Ed. 403. The amount of the plaintiffs' claim in the original bill of complaint in which the receiver was appointed herein was $13,831.45; this sum clearly meeting the requirement of the Federal Judicial Code. The appointment of the receiver herein was therefore made by this court within the proper scope of its equity jurisdiction. The District Court having possession and control of property in the hands of its receiver has jurisdiction to hear and determine all questions of taxes, liens, and priorities. Fidelity Trust Co. v. Tennessee Charcoal Iron Co., 3 F.(2d) 857 (C.C.A.6th) ; Ex parte Tyler, Petitioner, 149 U.S. 164, 13 S.Ct. 785, 37 L.Ed. 689.

■ On March 7, 1935, possession and control of the property of the defendant, Detroit & Canada Tunnel Company, was placed by this court in the hands of George R. Cooke, trustee in reorganization proceedings under section 77B of the Federal Bankruptcy Act (11 U.S.C.A. § 207). Subdivision (i) of section 77B of the Bankruptcy Act (11 U.S.C.A. § 207 (i) provides that, where a receiver has previously been appointed, the judge, in reorganization proceedings in bankruptcy, "shall make such orders as he may deem equitable for the protection of obligations incurred by the receiver * * * and for the payment of such reasonable administrative expenses and allowances in the prior proceeding as may be fixed by the Court appointing said receiver."

It follows, therefore, that the present trustee, who is in control of the property in question, can only pay the taxes here involved after the amount thereof has been fixed by this court in these receivership proceedings. The facts in the matter at bar as stated by the pleadings present a federal question such as to confer jurisdiction upon this court in equity, and the exercise of jurisdiction herein is required by reason of the pendency of the receivership and reorganization proceedings.

■ Section 3444 (as amended by Act No. 32 of 1931), and sections 3507, 3547, of the Michigan Compiled Laws of 1929, requiring the payment of taxes under protest, and the review of tax assessments by the state tax commission, whose decision is thereby made final, and further forbidding any injunction to stay proceedings for the assessment or collection of taxes, do not preclude the granting of the relief herein sought. Ex parte Tyler, 149 U.S. 164, 13 S.Ct. 785, 37 L.Ed. 689; Beaverton Tp. v. Lord, 235 Mich. 261, 209 N.W. 122. As the Supreme Court has recently stated, under our system there is no warrant for the view that the judicial power of a competent court can be circumscribed by any legislative arrangement designed to give effect to administrative action going beyond the limits of constitutional authority. St. Joseph Stock Yards Co. v. United States et al., 298 U.S. 38, 56 S.Ct. 720, 80 L.Ed. ——. April 27, 1936.

■ Section 154 of title 26 of the United States Code (26 U.S.C.A. § 1543), providing that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court," does not preclude the court in these proceedings from assuming jurisdiction and granting the relief prayed for. The petitioner is seeking instructions from the court as to the determination of the validity and amount of taxes alleged to be invalid, and is not bringing a suit for the purpose of restraining the assessment or collection of a valid tax. Scott v. Western Pac. R. Co. (C.C.A.) 246 F. 545. The foregoing section of the United States Code applies only to federal taxes. State Railroad Tax Cases, 92 U.S. 575, 613, 23 L.Ed. 663.

■ These proceedings are not precluded by section 8 of the Detroit city ordinance granting to the defendant company franchise rights underneath the streets and city-owned river bed and which provides, in substance, that nothing therein should be construed as a waiver of the right of the city to impose either personal or real property taxes upon the property of the tunnel company. The petitioner herein is not seeking to escape such taxation, nor claiming that the city has waived the right to impose taxes upon this property. This provision of the ordinance merely preserved to the city the right to levy such taxes in accordance with law, and the petitioner is only claiming that the assessing officers have not followed legal requirements in assessing this property for taxation. The right of purchase given to the city of Detroit by section 3 of said ordinance, assuming such right now exists, it not being necessary to so determine, is in no way prejudiced or affected by these proceedings, and the provisions of said section in no way preclude this action.

997

Granting then, that the jurisdiction of this court in these proceedings has been properly invoked, has there been violation of constitutional rights as asserted by the petitioner rendering the assessments in question void?

It is stipulated by respondents (stipulated facts, Exhibit 16, par. 14; 1934 petition, par. 13; city answer 1934, par. 5; county answer 1934, par. V) that the tunnel properties in question are so designed and of such a character as to be usable for a single purpose only, and under the circumstances involved this property must be classified as a single purpose property, so called, for purposes of taxation. It must also be classified for such purposes as a public utility. A public utility is generally known in the law as a business organization which regularly supplies the public with some commodity or service. The distinguishing characteristic of a public utility is the devotion of private property by the owner or person in control thereof to such a use that the public generally, or that part of the public which has been served and has accepted the service, has the right to demand that the use or service, so long as it is continued, shall be furnished without unreasonable discrimination with reasonable efficiency and under proper and reasonable charges. 51 C.J. 4. The tunnel property here involved is devoted to the public service under regulations and methods of operation such as to bring it clearly within this definition of a public utility.

The defendant tunnel company is properly incorporated under the General Corporation Act of Michigan, so called, under which many other public utilities are required to be incorporated. Railroad companies and railroad tunnel companies (as distinguished from highway tunnel companies such as the defendant) are required to incorporate under special acts. There is no special Michigan law under which all public utilities are required to incorporate, and the Legislature has not defined public utilities. Under these circumstances, the fact that the defendant company is organized under the act governing the organization of general business corporations is no indication, as contended by the respondents, that the property and business of the company is not properly classified as a public utility. Section 3555 of Michigan Compiled Laws of 1929 requires the property of certain rail carriers and of telephone and telegraph companies to be assessed by the Michigan state tax commission and a specific tax paid thereon in lieu of other taxes. Highway tunnel companies and many other public utility companies are not included. This is no indication that the business and property of the defendant company is not properly classified as a public utility; there being nothing in the language of the statutes to indicate that a company cannot be considered a public utility unless it is included therein. The purpose and nature of its business and devotion of its property to the public use under the circumstances involved, and not the statute under which it is incorporated or described for purposes of taxation, determines whether or not it is a public utility. 51 C. J. 5.

It is a well-established principle of law that in arriving at the true cash value, within the provisions of the Michigan tax laws and other similar statutes, of a single purpose, public utility property, such as here involved, whose only value is derived from its capacity to earn money by its use for a definite single purpose, the so-called capitalization of net income method, sometimes called the net earnings method, should be given primary and paramount weight, either as the sole method of valuation or as used in combination with the stock and bond valuation method, so called, where, as in the present case, it appears that the property has received economical and prudent management and that such method shows a valuation so substantially less than the depreciated cost of such property as to render an assessment based on such cost clearly and grossly excessive and arbitrary. Great Northern Railway Co. v. Weeks, 297 U.S. 135, 56 S.Ct. 426, 80 L.Ed. 532; Cleveland, Cincinnati, Chicago & St. Louis Railway Co. v. Backus, 154 U.S. 439, 14 S.Ct. 1122, 38 L.Ed. 1041; Chicago & Northwestern Railway Co. v. Eveland (C.C.A. 8th) 13 F.(2d) 442; Cumberland Pipe Line Co. v. Lewis (D.C.) 17 F.(2d) 167; Northern Pac. Ry. Co. v. Adams County (D.C.) 1 F.Supp. 163; People ex rel. Albany & Greenbush Bridge Co. v. Weaver, 67 How.Prac.(N.Y.) 477; People ex rel. Jamaica Water Supply Co. v. State Board of Tax Com'rs, 196 N.Y. 39, 89 N.E. 581; State v. Ill. Central R. Co., 27 Ill. 64, 79 Am. Dec. 396; State v. Virginia & Truckee R. Co., 23 Nev. 283, 46 P. 723, 35 L.R.A.

998

759; State v. Nevada Central R. Co., 28 Nev. 186, 81 P. 99, 113 Am.St.Rep. 834; Oregon-Washington Railroad & Navigation Co. v. Thurston County, 98 Wash. 218, 219, 167 P. 930; 26 R.C.L. 637.

The principle is recognized in section 3415, Michigan Compiled Laws 1929, which provides that: "In determining the value the assessor shall also consider the advantages and disadvantages of location."

In Alpena Power Co. v. Caledonia Tp., 194 Mich. 622, 161 N.W. 829, the Michigan Supreme Court, in upholding an assessment based in part by the assessor upon this language of the Michigan Tax Law, said: "He had a right to consider this, as it was helpful in determining its earnnig power— an essential element always taken into consideration in arriving at the selling price."

How, then, would the "true cash value" of this tunnel property be determined? By what method, and on the basis of what factors, is that value to be arrived at? In dealing with many kinds of property, both chattels and real estate, there is often, if not usually, information available as to the prices at which similar properties, or the very property in question, has been sold. As already stated, however, there is no such information available here, as there has apparently been no such sale or even offer of sale or of purchase. Again, in dealing with many kinds of property, and particularly with real estate generally, it is possible to consider various uses to which the property can be put. The value of property should, of course, or at least properly may, be measured by the most valuable use to which it can be devoted or adapted. The tunnel property, however, here involved cannot, under any stretch of the imagination, be considered as having any value except that arising from its use as a highway for travel between Detroit and Windsor. It seems obvious that this property cannot be now used, and cannot be changed so as to be capable of use, for any other purpose having any possible connection with value, whether going concern value, scrap value, sentimental value, æsthetic value, or other value, either present or future. It is property which obviously in the coming years can never be used for any purpose except that for which it is now used.

With some properties, such, for example, as works of art, the element of sentiment may have a bearing on value and yet have no relation to income. No such element is present here. This proper-

ty has no appeal, attraction, or value, either to its present owner or to any prospective purchaser, except on the basis of the financial returns which can be expected to be realized from its commercial operation as a tunnel toll highway. It is inconceivable that one would care to own it for any other reason than the hope and expectation of monetary returns from such ownership. With this class of property so limited in its use, there is only one way in which its value can be determined, and that is by giving paramount consideration and effect to its earning power. Great Northern Ry. Co. v. Weeks, supra; Southern R. Co. v. Com. of Kentucky, supra; Cleveland, C. C. & St. L. R. Co. v. Backus, 154 U.S. 439, 445, 14 S.Ct. 1122, 38 L.Ed. 1041, 1046.

The original, or reproduction, construction cost of this tunnel is so enormous that there is absolutely no apparent relation between such cost and its earning capacity. Nor does such cost appear to have any possible bearing upon such earning capacity. If nature had constructed this tunnel in its present form, it would be as valuable to its owner as it now is. It would be as valuable to the owner or a prospective purchaser, regardless of its original cost. Its cost does not always enter into the question as to what price a purchaser would pay or a seller would take. The basis for a sale price would be the present, and probable future, earning power of the property; and certainly present and past earnings are proper and important factors in judging what earnings may fairly be expected in the future.

Therefore it is the conclusion of the court that the tunnel property here involved is of such character as to be usable for a single purpose only; that it is devoted to the public service under regulations and methods of operation, as to classify it as a public utility; also that the capitalization of earnings method should have been given controlling consideration and effect by the assessing officers in arriving at the true cash value of the property, within the meaning and scope of the applicable Michigan statutes; that the taxing authorities, in basing their valuations for the three years in question entirely upon depreciated cost, and in failing to give any consideration or weight to the capitalization of net income method, have adopted a fundamentally erroneous principle or method of arriving at the true cash value of the property in question, in violation of the due process clause of the Fourteenth Amendment to the

Constitution of the United States, and the resulting assessments are therefore illegal and void. Great Northern Railway Co. v. Weeks, 297 U.S. 135, 56 S.Ct. 426, 80 L.Ed. 532; Cleveland, Cincinnati, Chicago & St. Louis Railway Co. v. Backus, 154 U.S. 439, 14 S.Ct. 1122, 38 L.Ed. 1041; Chicago & Northwestern Railway Co. v. Eveland (C. C.A.8th) 13 F.(2d) 442; Cumberland Pipe Line Co. v. Lewis (D.C.) 17 F.(2d) 167; Northern Pac. Ry. Co. v. Adams County (D.C.) 1 F.Supp. 163; People ex rel. Albany & Greenbush Bridge Co. v. Weaver, 67 How.Prac.(N.Y.) 477; People ex rel. Jamaica Water Supply Co. v. State Board of Tax Com'rs, 196 N.Y. 39, 89 N.E. 581; State v. Ill. Central R. Co., 27 Ill. 64, 79 Am.Dec. 396; State v. Virginia & Truckee R. Co., 23 Nev. 283, 46 P. 723, 35 L.R.A. 759; State v. Nevada Central R. Co., 28 Nev. 186, 81 P. 99, 113 Am.St.Rep. 834; Oregon-Washington Railroad & Navigation Co. v. Thurston County, 98 Wash. 218, 219, 167 P. 930; 26 R.C.L. 637.

Valuations for the three years in question as reported by the master in chancery herein, upon a basis of average net operating earnings capitalized at 7 per cent., as compared with the assessments imposed by the taxing authorities, together with the corresponding tax liability, is as follows:

163 (and cases cited); Mobile & O. R. Co. v. Schnipper (D.C.) 31 F.(2d) 587.

Contrary to the contention of the respondent taxing authorities, the capitalization of earnings method of valuation has not by precedent been applied solely to the valuation of railroad properties. In frequent decisions this principle of valuation has been applied to such utilities as bridges, canals, toll roads, power plants, and pipe lines. People ex rel. Albany & Greenbush Bridge Co. v. Weaver, 67 How.Prac.(N.Y.) 477; People ex rel. Jamaica Water Supply Co. v. State Board of Tax Com'rs, 196 N.Y. 39, 89 N.E. 581; People ex rel. Delaware & Hudson Canal Co. v. Roosa, 41 Hun, 639; People ex rel. Delaware & Hudson Canal Co. v. Keator, 2 How.Prac.(N.S.) (N.Y.) 479; Alpena Power Co. v. Caledonia Tp., 194 Mich. 622, 161 N.W. 829; State v. Virginia & Truckee Railroad Co., 23 Nev. 283, 46 P. 723, 35 L.R.A. 759 (referring to toll road); Cumberland Pipe Line Co. v. Lewis (D.C.) 17 F.(2d) 167. If there is any particular class of property to which the principle of capitalization of earning power is limited, it is public utility such as that here involved, which can be used solely for one purpose and whose only value arises from and is based upon its power to earn income from such use. In

| | Master in Chancery (Supplemental Rept.) | | Assessors | |
|---|---|---|---|---|
| | Valuation—Earnings Capitalized at 7% | Taxes—City, County & State | Valuation—Cost less Depreciation | Taxes—City, County & State |
| 1932 | $848,937.50 | $30,205.56 | $3,699,450.00 | $131,628.13 |
| 1933 | 848,937.50 | 24,181.03 | 3,610,210.00 | 107,085.45 |
| 1934 | 848,937.50 | 25,640.72 | 3,542,530.00 | 106,996.19 |
| | | $81,027.31 | | $345,709.77 |

It is apparent that the valuation of this property by the assessors is so grossly excessive and their intentional, persistent, and systematic policy in this respect so arbitrary, as to be the equivalent of fraud, and that in these circumstances, within established principles, the assessments are in violation of constitutional limitations and must be set aside. Great Northern R. Co. v. Weeks, 297 U.S. 135, 56 S.Ct. 426, 80 L. Ed. 532; Louisville & Nashville R. Co. v. Bosworth (D.C.) 230 F. 191; Northern Pac. R. Co. v. Adams County (D.C.) 1 F.Supp.

the decided cases involving railroads and other utilities in which this principle has been found to be a fundamentally essential method to be used by assessing officers, the reason for the application of the rule was found in the basic fact that the property in question was usable for a single purpose only. This is equally true in the present case.

The applicable principle was stated and discussed in State v. Virginia & Truckee Railroad Co., supra, 23 Nev. 283, 46 P. 723, 35 L.R.A. 759, as follows: "Wherever

property has a well-defined market value, which is usually the case with personal property, with town and farm property, the market value is usually the best criterion of its value for purposes of taxation. It is fair to presume that property to be taken in payment of a just debt from a solvent debtor would be appraised at what it is reasonably worth in the market,—at what it would probably bring. * * * But there are many other kinds of property to which this test would be entirely inapplicable. It cannot be said, although sometimes bought and sold, that they have a market value. Such, for instance, is a water ditch, a salt marsh, a borax field, or a mine of any kind. A toll road is another instance. Take, for example, the famous 'Geiger Grade,' which must have cost many thousands of dollars, and have been, at one time, a wonderful productive piece of property, but which now would probably not pay the wages of a toll keeper. The market cannot be appealed to to fix a value upon such property, but its value may be and must be fixed by other obvious considerations. A railroad comes within this class. Railroads are bought and sold so seldom, and the value of each road depends so entirely upon its surroundings, that in determining the amount at which such property would be appraised if taken in payment of a debt we must resort to other principles. Railroads are usually constructed and operated for profit. They are not valued, as men sometimes value a beautiful home, a horse, or a diamond, for the pleasure that comes from their ownership, but for the returns that can be obtained from them as a business investment. Neither are they usually held for speculative purposes, as much other property, particularly unimproved lands, town and city property, is so often held. The value of a railroad is generally strictly prosaic and utilitarian. To obtain any return from it, either present or prospective, a railroad must be operated. It cannot lie idle, and at the same time increase in value through the natural increase of population and business. As it must be operated, expense must be constantly incurred, and the result is that its true value as a railroad depends very largely—almost entirely—upon what its net income can be expected to be. It is reasonable to suppose that the owners of a road will operate it to their own best advantage,—that they will obtain all the income possible, and keep the expense of operation as low as possible. This should certainly be the presumption in the absence of a showing to the contrary; and it follows, where a road has been operated for a number of years, that what it has done in the past is a very good criterion of what it may be expected to do, under the same conditions, in the future."

It is obvious that the language just quoted is as applicable to the tunnel property here involved as it is to a railroad property.

In People ex rel. Albany & Greenbush Bridge Co. v. Weaver, supra, 67 How.Prac. (N.Y.) 477, at page 478 et seq., it was said: "A dwelling-house or a farm may have, by reason of advantages of location for beauty or for health, or the expenditure thereon of large sums of money to gratify the taste or to conduce to the comfort of the owner, a greater value than its earning capacity, but property of the description of that owned by the relator, built exclusively to earn money for its owners, must be judged by its ability to accomplish the purpose for which it was constructed. * * * Under such circumstances it would be unjust to base the valuation of the property of the relator upon its actual cost, for such cost has as yet added nothing to its earning capacity, and whether or not it will do so in the future is as yet entirely problematical. * * * A reference to the testimony given upon the hearing before the assessors relating to the cost of the bridge and its approaches, and that which shows the cost at which the property could be reproduced at the present time, shows that the assessors in valuing such property were governed by the cost of the structure rather than by its earning capacity. In so doing they disregarded the adjudication of this court at general term, and for that reason their judgment of value cannot be upheld."

As was pointed out by the Supreme Court in Cleveland, Cincinnati, Chicago & St. Louis Railway Co. v. Backus, supra, 154 U.S. 439, at page 445, 14 S.Ct. 1122, 1124, 38 L.Ed. 1041, "The rule of property taxation is that the value of the property is the basis of taxation. It does not mean a tax upon the earnings which the property makes, nor for the privilege of using the property, but rests solely upon the value. But the value of property results from the use to which it is put, and varies with the profitableness of that use, present and prospective, actual and anticipated. There is no pecuniary value outside of that which results from such use. The amount and profitable character of such use determines the

value, and, if property is taxed at its actual cash value, it is taxed upon something which is created by the uses to which it is put."

Indeed, section 3415 of the Michigan Compiled Laws of 1929 provides that "in determining the value the assessor shall also consider the advantages and disadvantages of location," which required the assessors to consider the earning power of this tunnel resulting from its location. Alpena Power Co. v. Caledonia Tp., 194 Mich. 622, 161 N.W. 829.

It is urged by the city and county that, as the statutes require the assessors to value all property at its true cash value, they are not required to follow or consider any particular method in determining such cash value. It is, however, obvious that the assessing officers, in computing what they deem to be the true cash value of any property, must give reasonable consideration and effect to whatever method or methods have, by statute or common law, been established as fundamentally essential. Otherwise the assessment made will be wholly arbitrary and the property of the taxpayer will be taken without due process of law. An examination of the statutes involved in most of the cases in which the capitalization of earnings method has been declared to be a fundamentally correct method of valuing a single purpose property discloses that they are substantially to the same effect as the Michigan statutes requiring the assessors to determine the "true cash value" of the property. Thus, in State v. Virginia & Truckee Railroad Co., 23 Nev. 283, 46 P. 723, 35 L.R.A. 759, the term "full cash value" in the statute was declared to mean "the amount at which the property would be appraised if taken in payment of a just debt due from a solvent debtor." The court said: "A railroad, then, the same as every other class of property, is to be assessed at its true cash value—at such an amount as it would be appraised if taken in payment of a just debt due from a solvent debtor. But this does not necessarily mean that the same rules and principles are to be applied to all the different kinds in determining what their true cash value is. The true value of each class is to be determined by evidence applicable to that class."

In People ex rel. Albany & Greenbush Bridge Co. v. Weaver, 67 How.Prac.(N.Y.) 477, at page 479, involving the assessment of a bridge across the Hudson river, in considering an assessment made under New York statutes which required real estate to be assessed at the full and true value thereof at which the assessors would appraise it in payment of a just debt due from a solvent debtor, the court said: "In determining the value of the property of the relator in the mode which the statute directs, it is an evidently sound proposition that the true criterion of such value must be its earning capacity."

In Northern Pacific Ry. Co. v. Adams County (D.C.) 1 F.Supp. 163, 171, at page 185, it was said: "It has been suggested that the court is foreclosed against making the inquiry which has led to the finding of invalidity because the state of Washington does not specifically define a method of valuing railroad operating property, but neither does the statute define any specific method by which the general property of the state shall be assessed, yet under the Washington statute and similar statutes in other jurisdictions the books abound in cases where relief has been granted in respect of such property where valuations have been grossly excessive or have been arbitary or capricious or made by the use of fundamentally wrong principles or methods."

In the recent case of Great Northern R. Co. v. Weeks, supra, 297 U.S. 135, 56 S.Ct. 426, 434, 80 L.Ed. 532 the state law of North Dakota required all property subject to taxation to be assessed at its true and full value in money. The court set aside the 1933 assessment against the petitioner's railroad property on the ground that the assessors had failed to give reasonable consideration and effect to established methods of valuation as required by the due process clause of the Fourteenth Amendment, stating (297 U.S. 135, 56 S.Ct. 423, 434, 80 L.Ed. 532): "The board persistently disregarded known conditions essential to the just ascertainment of value. * * * The facts alleged in respondents' answer and those shown by the testimony of their witness and his computations * * * compel the conclusion that, by reason of changed conditions affecting value, the methods or system by which the board arrived at the 1933 value of petitioner's railway as a whole were plainly calculated to produce a grossly excessive assessment of its North Dakota property for that year. * * * Unquestionably, the assessment was made in plain violation of established principles that governed property valuation."

 Having found the tax assessments in question illegal and void, it is the clear and unavoidable duty of this court, under the circumstances here presented, to proceed to determine the true cash value of this property and the amount of ad valorem taxes payable thereon for the three years in question, and to enjoin the collection of the excessive portion of the tax upon the condition of the payment of the just portion. Great Northern R. Co. v. Weeks, 56 S.Ct. 426, 80 L.Ed. 396; Cummings v. Merchants' National Bank, 101 U.S. 153, 25 L.Ed. 903; Raymond v. Chicago Union Traction Co., 207 U.S. 20, 28 S.Ct. 7, 52 L.Ed. 78, 12 Ann.Cas. 757; Trustees of Cincinnati Southern Ry. v. Guenther (C.C.) 19 F. 395; Louisville & Nashville R. Co. v. Bosworth (D.C.) 230 F. 191; - Cottle v. Union Pac. R. Co. (C.C.A.) 201 F. 39; Chicago & Northwestern R. Co. v. Eveland (C.C.A.) 13 F.(2d) 442; Cumberland Pipe Line Co. v. Lewis (D.C.) 17 F.(2d) 167; Northern Pac. Ry. Co. v. Adams County (D.C.) 1 F.Supp. 163; Chicago & N. W. Ry. Co. v. Rowley (D.C.) 1 F.Supp. 729; Lowther v. Moore, 191 Ky. 284, 229 S.W. 705; State v. Superior Ct., 93 Wash. 433, 161 P. 77.

 The true cash value of the tunnel property in question depends solely upon its earning capacity. Its depreciated cost or reproduction cost bears no relation to such earning capacity. This court, therefore, should give no weight to cost factors in determining its true cash value. State v. Nevada Central R. Co., 28 Nev. 186, 81 P. 99, 113 Am.St.Rep. 834, 841.

The market values of the outstanding securities of the defendant company give a value to the property in question substantially less than its value arrived at by the capitalized earnings method. The inactivity of the market for these securities and their negligible value is such, under the circumstances, that no weight should be given to the stock and bond method of valuation, so called, in the present instance. There is also no information as to sales of this or similar property to be considered. For the purpose of arriving at the amount which may be considered for the purposes of these proceedings as being the just portion of the taxes payable by the petitioner, the capitalized net earnings method must therefore be given controlling consideration and effect.

The record shows that the portion of the taxable property in question which is located entirely within the United States comprises 45 per cent. of the total property in the United States and Canada involved in using the capitalization of net earnings method.

 No evidence has been offered in behalf of the respondent taxing authorities as to the rate of return to be used in arriving at the rate of valuation of the property in question by the capitalization of net earnings method, nor as to the details of valuation upon this basis. Considerable evidence in this connection was offered in behalf of the petitioner, including the testimony of an expert witness of outstanding reputation and experience in the field of economics, finance, and investments, who prepared elaborate tabulations and computations taken from the audited operating records of the company. Although all witnesses called in behalf of the petitioner testified that a rate of return of 10 per cent. per annum be used, it is the conclusion of the court, under all of the circumstances, that a rate of 7 per cent. should be used for this purpose.

Under the undisputed evidence, an allowance of $35,000 should be made in order to provide for the present value of possible future increased earnings for that portion of the taxable property in question located entirely within the United States.

Using, then, the rate of return of 7 per cent., taking into consideration the undisputed evidence in the record as to the actual net operating earnings of the tunnel property during the years 1931, 1932, 1933, and 1934, and making proper annual provision for necessary depreciation, amortization, corporation taxes, federal income tax, property taxes, and all other applicable elements and factors, the valuation of the property in question by the capitalization of net earnings method which I find to be its true cash value, and the resulting tax indebtedness for the three years in question, which I find and determine to be due, is as follows; (Exhibits 125, 126, 127, and 128, and master's supplemental report)

| | Net Earnings | Capitalized at 7% |
|---|---|---|
| 1931 | $153,126.58 | $2,150,000.00 |
| 1932 | 135,507.76 | 1,930,000.00 |
| 1933 | 103,014.36 | 1,475,000.00 |
| 1934 | 118,223.37 | 1,680,000.00 |
| Average for four years, | | 1,808,750.00 |
| 45% allocated to property within the United States, | | 813,937.50 |

Add $35,000.00 for present value of future increased earnings—Total Valuation $848,937.50

to the company-owned terminal property, it is still required to be treated as personal property for tax assessment purposes with-

| Year | Valuation | | Rate per Thousand | Tax |
|------|-----------|------|-------------------|-----|
| 1932 | $848,937.50 | City | 27.426 | $23,282.95 |
| | | State | 3.44869429 | 2,927.72 |
| | | County | 4.70576162 | 3,994.89 |
| 1933 | 848,937.50 | City | 24.090 | 20,450.90 |
| | | State | .58920350 | 500.10 |
| | | County | 4.98263166 | 4,229.94 |
| 1934 | 848,937.50 | City | 24.657 | 20,932.50 |
| | | State | .60 | 509.58 |
| | | County | 4.95 | 4,198.89 |

Making allowance for the $50,000 already paid to the city of Detroit, there now remains the sum of $14,666.10 to be paid to the city of Detroit and the sum of $16,361.21 to the county of Wayne, in full payment, without interest or penalties, of the city, county, and state taxes on this property for the three years 1932, 1933, and 1934. The said amount of $14,666.10 due the city of Detroit (together with the sum of $50,000 heretofore paid by the receiver herein) is applicable as follows:

| | |
|---|---|
| 1932 City Taxes, | $23,282.95 |
| 1933 City Taxes, | 20,450.90 |
| 1934 City Taxes, | 20,932.25 |
| | |
| Total, | 64,666.10 |
| Previously paid (to be applied first, under stipulation, upon 1932 and 1933 taxes,) | 50,000.00 |
| | |
| Balance due on 1934 Taxes, | 14,666.00 |

The said amount of $16,361.21 to be paid to the county of Wayne is applicable as follows:

| | |
|---|---|
| 1932 State Taxes, | $ 2,927.72 |
| 1933 State Taxes, | 500.19 |
| 1934 State Taxes, | 509.58 |
| 1932 County Taxes, | 3,994.89 |
| 1933 County Taxes, | 4,229.94 |
| 1934 County Taxes, | 4,198.89 |
| | |
| | $16,361.21 |

Under sections 3396 (as amended) and 3402 of the Michigan Compiled Laws of 1929, the portion of the tunnel structure situated under the land and river bed admittedly belonging to the city of Detroit should have been assessed as personal property and not as real property. Whether or not this portion of the tunnel structure constitutes a fixture appurtenant in the specific language of the Michigan tax statutes. The petitioner, however, has not been prejudiced by the erroneous action of the taxing authorities in this respect, and this error on their part is no ground for setting aside the assessment. All taxes falling due during the receivership are payable out of the funds in the hands of the receiver as administrative expenses of the receivership. Bear River Paper & Bag Co. v. Petoskey (C.C.A.) 241 F. 53.

The superiority, under the law of Michigan, of the lien created by the outstanding mortgage of the defendant company upon that portion of the tunnel property assessable as personal property, does not entitle the mortgagee to any of the income from the property, inasmuch as no steps have as yet been taken to obtain possession of the property under the mortgage lien, and the preferred claim of the taxing authorities for the amount determined herein to be due them is not defeated because of the possible superiority of the mortgage lien. Detroit Trust Co. v. City of Detroit, 269 Mich. 81, 256 N.W. 811; United States Trust Co. v. Wabash, St. L. & P. Ry. Co., 150 U.S. 287, 14 S.Ct. 86, 37 L.Ed. 1085; Dulberg v. Zankel (C.C.A.) 67 F.(2d) 534.

No question of priority of claims is here presented. If, by reason of the error of the taking authorities in failing to assess the underground portion of the tunnel property as personal property, the petitioner shall be prejudiced as to tax claims for future years, the question may be again presented without prejudice because of the determination of the court made herein.

A decree may be entered determining said amounts due and payable to the city and county in full payment of said taxes, which amounts are allowed as preferred claims to the said city and county and approving payment thereof by the trustee in

the reorganization proceedings pending in this court; and, upon payment of said amounts respectively, the said defendant, Detroit & Canada Tunnel Company, and the said George R. Cooke, as receiver and trustee, respectively, are discharged from all liability to said city, county or state on account said taxes on the property in question, and all tax liens asserted thereon in behalf of said city, county, or state are discharged, and injunctive relief herein is allowed.

Decree may be settled accordingly.